# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LATASHA ROUSE, et al.,

  Plaintiffs,

   v.         **Civ. No. JKB-22-00129**

GOVERNOR WES MOORE, et al.,

  Defendants.

## MEMORANDUM

Plaintiffs Latasha and Exabia Rouse, Daniel and Jessica Riley, and Oscar and Sherryl Davines brought this action against Wes Moore, in his official capacity as Governor of the State of Maryland, and the Justices and Chief Justice of the Maryland Supreme Court in their official capacities (the "Justices"). (ECF No. 42.) Plaintiffs allege that Maryland's Uniform Enforcement of Foreign Judgments Act ("UEFJA"), Md. Code Ann., Cts. & Jud. P. § 11-801 *et seq.*, as well as several of Maryland's Court Rules (the "Maryland Rules"), improperly allowed a purported creditor to register and enforce foreign judgments against them in Maryland without following certain procedures prescribed by the Servicemembers Civil Relief Act ("SCRA"), 50 U.S.C. § 3901 *et seq.*, or the personal jurisdictional requirements of the Fourteenth Amendment's Due Process Clause. (*Id.*)

Defendants moved to dismiss (ECF No. 46), and Plaintiffs simultaneously opposed that Motion and filed a Cross Motion for Partial Summary Judgment (ECF No. 49). For the reasons set forth below, the Motion to Dismiss will be granted in part and denied in part and the Motion for Summary Judgment will be denied.

1

## I.     LEGAL STANDARD

Defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. (ECF No. 46-1 at 14–15.)[1] Plaintiffs have moved for summary judgment under Rule 56(a). (ECF No. 49 at 17.)

When considering a motion to dismiss, the "well-pled allegations of the complaint" are accepted as true and "the facts and reasonable inferences derived therefrom" are construed "in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997) (citation omitted); *see also Medlock v. Rumsfeld*, 336 F.Supp.2d 452, 460–61 (D. Md. 2002) (where a defendant asserts "that the complaint fails to allege facts upon which subject matter [jurisdiction] can be based" under Rule 12(b)(1), "the allegations in the complaint are assumed to be true"). "The court need not, however, accept unsupported legal conclusions, legal conclusions couched as factual allegations, or conclusory factual allegations devoid of any reference to actual events." *Medlock*, 336 F.Supp.2d at 460 (citations omitted). The Court will reference the dockets of the Maryland state court proceedings that underly Plaintiffs' claims, as they were attached to Defendants' Motion to Dismiss and are both "integral to the complaint" and undisputedly authentic. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court will assess the merits of the motion for summary judgment, and any responses, viewing all facts and reasonable inferences in the light most favorable to the opposing party, here, the Defendants. *Scott v. Harris*, 550 U.S. 372, 378 (2007). If there are no genuinely disputed facts, a "district court may resolve the legal questions between the parties as a matter of law and enter

---

[1] Unless the document uses numbered paragraphs, page numbers in citations to the Parties' briefing reference the CM/ECF generated page numbers in the heading of the relevant document.

2

judgment accordingly." *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995).

Plaintiffs bear the burden to demonstrate that they are entitled to summary judgment, while Defendants bear the burden to show that Plaintiffs' claims should be dismissed, except that Plaintiffs bear the burden of demonstrating that jurisdiction in this Court is proper. When considering whether a claim should be dismissed, the Court will take Plaintiffs' factual allegations as true and draw reasonable inferences in their favor; but, while considering whether Plaintiffs are entitled to summary judgment, the Court will construe any disputed facts in the light most favorable to the Defendants. While the burden may rest with a particular Party, neither Party's legal conclusions are taken as true or accorded any deference by the Court.

## II.    BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs are three married couples, each with one servicemember spouse who was on active duty at all relevant times. (ECF No. 42 ¶¶ 24–26.) The Rouses and the Davineses reside in Hawaii, and the Rileys reside in North Carolina. *(Id.)* The case before the Court arose from Plaintiffs' dealings with one George LeMay.[2] The Rouses, Rileys, and Davineses each entered into "purported contract[s] for consumer goods" with LeMay; the Rouses' contract was signed in Hawaii, while the Rileys' and the Davineses' contracts were formed in Texas. (*Id.* ¶¶ 53, 77, 129.) The Rouses allege that their contract with LeMay "was unenforceable as a matter of law" and that they "timely canceled" it. (*Id.* ¶¶ 53–54.) Nonetheless, LeMay sued the Rouses in Nevada state court to enforce the contract and obtained a judgment against them in the amount of $2,492.64. (*Id.* ¶ 58); *see LeMay v. Rouse*, Case No. D-122-JG-21-000018 (Dist. Ct. Md. Garrett Cnty. June

---

[2] Plaintiffs originally named LeMay as a Defendant in this litigation. (*See* ECF No. 1.) Plaintiffs have since settled their claims with LeMay and filed an Amended Complaint against only Governor Moore and the Justices. (*See* ECF Nos. 41, 42.)

21, 2021) (ECF No. 46-2). LeMay sued the Rileys and the Davineses to enforce their respective contracts in Texas state court, where he obtained judgments against them in the amounts of $3,653.44 and $3,455.81, respectively. (ECF No. 42 ¶¶ 77, 129); see *LeMay v. Riley*, Case No. D-07-JG-20-000173 (Dist. Ct. Md. Anne Arundel Cnty. Aug. 12, 2020) (ECF No. 46-5); *LeMay v. Davines*, Case No. D-07-JG-20-000146 (Dist. Ct. Md. Anne Arundel Cnty. June 30, 2020) (ECF No. 46-8). On appeal in Texas, both judgments were vacated. (ECF No. 42 ¶¶ 80, 131.)

Although the judgments he had obtained against Plaintiffs in Nevada and Texas were allegedly invalid, and although Plaintiffs had no connection to the State of Maryland, LeMay subsequently invoked the UEFJA to register all three foreign judgments in Maryland between June 2020 and June 2021. (*Id.* ¶¶ 24–26); *see LeMay v. Rouse*, Case No. D-122-JG-21-000018; *LeMay v. Riley*, Case No. D-07-JG-20-000173; *LeMay v. Davines,* Case No. D-07-JG-20-000146.

Maryland is one of forty-eight states to have adopted the UEFJA, which sets forth procedures for registering and enforcing foreign judgments.[3] To register a foreign judgment under the UEFJA in Maryland, a judgment creditor must file an authenticated copy of the judgment with the clerk of a Maryland district or circuit court. Md. Code Ann., Cts. & Jud. Proc. § 11-802(a)(2). Consistent with the Full Faith and Credit Clause of the United States Constitution, the UEFJA provides that, once filed, a "foreign judgment has the same effect and is subject to the same procedures, defenses, and proceedings . . . as a judgment of the court in which it is filed." *Id.* § 11-802(b); *see* U.S. Const. art. IV, § 1.

LeMay then filed petitions for writs of garnishment against each couple, which were issued by the Maryland District Courts presiding over the *ex parte* collection proceedings. (ECF No. 42

---

[3]   *See   Enforcement   of   Foreign   Judgments   Act*,   Uniform   Law   Commission, https://www.uniformlaws.org/committees/community-home?CommunityKey=e70884d0-db03-414d-b19a-f617bf3e25a3 (last visited March 13, 2024).

¶¶ 69, 95, 146.) The presiding courts did not appoint counsel for Plaintiffs, none of whom had yet appeared in these proceedings, prior to enrolling LeMay's judgments or issuing writs of garnishment. (*Id.* ¶¶ 3, 70, 120, 153.) Instead, once Plaintiffs learned of the proceedings, they "were required to incur costs to obtain counsel to defend their rights." (*Id.* ¶¶ 71, 123, 154.) At no time did LeMay file, or did the Maryland Courts require, any affidavit stating whether the Rileys, Rouses, or Davineses were servicemembers. (*See id.* ¶ 32.)

The Rouses were "subjected to at least 28 days of improper collection conduct," including the freezing of their accounts, before the Maryland District Court for Garrett County granted their petition to vacate LeMay's foreign judgment on July 19, 2021. (*Id.* ¶¶ 69, 74); *LeMay v. Rouse*, Case No. D-122-JG-21-000018. After registering his judgment against the Davineses, LeMay requested at least five writs of garnishment of their assets, and obtained at least two, before the Maryland District Court for Anne Arundel County granted the Davineses' motion to vacate on January 31, 2023. (ECF No. 42 ¶¶ 142–53); *LeMay v. Davines*, Case No. D-07-JG-20-000146.

As to the Rileys, LeMay requested four writs of garnishment and two subpoenas, all of which were issued by the District Court of Maryland for Anne Arundel County. (ECF No. 42 ¶¶ 91–119.) This went on for more than a year, during which certain of their accounts were frozen. (*Id.*) In October 2021, the garnishments were vacated, and the case was dismissed. *LeMay v. Riley*, Case No. D-07-JG-20-000173.

Plaintiffs commenced this action on January 18, 2022. (ECF No. 1.) Plaintiffs named LeMay as a Defendant, arguing that his actions had violated not only the SCRA but also Maryland's Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law § 13-101 *et seq.*, and its Consumer Debt Collection Act ("MCDCA"), Md. Code Ann., Com. Law § 14-201 *et seq.*

5

(*See generally id.*)  On January 24, 2023, Plaintiffs reached a settlement agreement with LeMay and he was subsequently dismissed with prejudice from this action.  (ECF No. 41.)

In their initial Complaint, Plaintiffs had also named then-Governor of Maryland Lawrence Hogan[4] as a Defendant in his official capacity.  (*See* ECF No. 1.)  After LeMay was dismissed from the lawsuit, Plaintiffs filed an Amended Complaint which reasserted their claims[5] against now-Governor of Maryland Wes Moore, again in his official capacity, and added as Defendants the Justices of the Supreme Court of Maryland—Chief Justice Matthew Fader and Justices Steven Gould, Brynja Booth, Shirley Watts, Michele Hotten, Jonathan Biran, and Angela Eaves—also in their official capacities.  (ECF No. 42.)

Plaintiffs contend (1) that the UEFJA and/or Maryland Rules conflict with and are preempted by the SCRA, (2) that the UEFJA and/or Maryland Rules fail to comport with the requirements of Due Process, and (3) that the Defendants violated the SCRA during the proceedings described above.  Plaintiffs seek damages and attorney's fees for the State of Maryland's alleged SCRA violations; an injunction preventing Maryland from "issu[ing] or enforc[ing] any purported judgments . . . that do not comply with the basic requirements of the SCRA;" an injunction directing Maryland to expunge all records of the collection proceedings involving LeMay and the Plaintiffs; and "Declarations of Law" that "the SCRA preempts Maryland law including the [UEFJA]" and that "any judgments obtained in violation of the SCRA in the State of Maryland . . . are unenforceable."  (*Id.* at 55–56.)  By way of relief for the alleged Due Process violation, Plaintiffs seek an injunction commanding Maryland to "amend its laws and

---

[4] Pursuant to Federal Rule of Civil Procedure 25(d), now-Governor of Maryland Wes Moore has since replaced former Governor Lawrence J. Hogan, Jr. as a Defendant in this case.  (*See* ECF No. 36.)

[5] Plaintiffs' Amended Complaint enumerates only one cause of action, in support of which they invoke the Supremacy Clause and the SCRA.  However, this style of pleading unhelpfully collapses multiple issues, which the Court will consider separately for clarity and convenience.

the Maryland Rules to bar violations of . . . the Due Process Clause of the Fourteenth Amendment." (*Id.* ¶ 184.)

Plaintiffs bring suit against Governor Moore because he is "'vested' with the 'executive power' of the State of Maryland," and is required "to 'take care that the Laws are faithfully executed'" and to "'inform the Legislature of the condition of the State and recommend to their consideration such measures as he may judge necessary and expedient.'" (*Id.* ¶ 27 (quoting Md. Const. Art. II, §§ 1, 9, 19).) This, Plaintiffs contend, makes Governor Moore a proper party to this suit.

Plaintiffs contend that the Justices are liable as members of the government entity responsible for "appoint[ing] members of the Rules Committee," "recommend[ing] . . . changes to the Maryland Rules," and "adopt[ing] amendments . . . and new rules of civil procedure that apply to every state court within Maryland." (*Id.* ¶ 28 (quoting Md. Const. Art. IV, § 18; Md. Code Ann., Cts. & Jud. Proc. § 13-301; Md. Rule 16-701).) The Justices are allegedly responsible for the "enforcement and application of the statutes and Maryland Rules at issue in this matter." (*Id.* ¶ 169.) Plaintiffs allege that Chief Justice Fader has "overall responsibility for the administration of the courts of the State," and argue that this makes him a proper Defendant. (*Id.* ¶ 28 (quoting Md. Rule 16-102(a)).)

The Parties do not appear to dispute that (1) LeMay registered foreign judgments against the Plaintiffs in Maryland, (2) LeMay obtained writs of garnishment and subpoenas affecting the Plaintiffs' before the Plaintiffs appeared in the state court actions, (3) LeMay never filed any affidavits regarding the Plaintiffs' servicemember status and no such affidavit was ever required, and (4) no attorney was ever appointed for the Plaintiffs.

7

The Parties dispute, *inter alia*, (1) the scope of the SCRA vis à vis the Maryland Rules and the UEFJA, (2) whether the Plaintiffs have standing to pursue their claims, and (3) whether there is some doctrinal bar or immunity protecting any or all of the Defendants from liability or divesting this Court of jurisdiction.

## III.    ANALYSIS

The Plaintiffs bring one count, but truly make several distinct legal arguments, and ask for various types of relief, all of which the Court will consider separately. First, the Court will consider whether the SCRA conflicts with the UEFJA and/or Maryland Rules, as well as whether the UEFJA violates the Due Process Clause. Next, the Court will turn to the Plaintiffs' cause of action and the relief sought and consider the issue of standing. Lastly, the Court will consider Defendants' arguments, including any further defenses or jurisdictional bars.

### A.    THE SERVICE MEMBERS CIVIL RELIEF ACT

The Servicemembers Civil Relief Act is intended to "provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during their military service." 50 U.S.C. § 3902(2). It, and its predecessor act (the Soldiers and Sailors Civil Relief Act), have long been "liberally construed to protect those who have been obliged to drop their own affairs to take up the burdens of the nation." *Boone v. Lightner*, 319 U.S. 561, 575 (1943). The SCRA prescribes procedural measures designed to ensure that active duty servicemembers are not surprised during their deployment by adverse legal or financial consequences at home. To achieve that end, it applies broadly, "to any judicial or administrative proceeding commenced in any court or agency in any jurisdiction subject to this chapter," excluding only "criminal proceedings." 50 U.S.C. § 3912(b).

Primarily at issue here is § 3931 of the SCRA, entitled "Protection of servicemembers against default judgments." This section applies to any state or federal "civil action or proceeding . . . in which the defendant *does not make an appearance*." *Id.* § 3931(a) (emphasis added). Section 3931 provides that a court "*shall require* the plaintiff to file with the court an affidavit" before the court enters "judgment for the plaintiff." *Id.* § 3931(b)(1) (emphasis added). The affidavit must state "whether or not the defendant is in military service" or "that the plaintiff is unable to determine whether or not the defendant is in military service." *Id.* If the defendant is in military service, then "the court *may not* enter a judgment until after the court appoints an attorney to represent the defendant." *Id.* § 3931(b)(2) (emphasis added). The language is prescriptive, not permissive—the court "shall require" the affidavit and "may not enter a judgment" until after appointing a lawyer. It places affirmative obligations on courts to ensure that servicemembers are protected in matters where they have not appeared.

Section 3931 goes on to offer additional protections courts must provide to servicemembers. It directs the court to "grant a stay of proceedings for a minimum period of 90 days under this subsection upon application of counsel, or on the court's own motion" if there is a defense that "cannot be presented without the presence of the defendant" or counsel has not been able to contact the defendant. *Id.* § 3931(d). It also provides a process for staying the proceedings and for vacating or setting aside a default judgment. *Id.* § 3931(f)–(g).

Section 3934, "Stay or vacation of execution of judgments, attachments, and garnishments," provides further protections to servicemembers. "If a servicemember, in the opinion of the court, is materially affected by reason of military service in complying with a court judgment or order, the court may on its own motion and shall on application by the servicemember

(1) stay the execution of any judgment or order entered against the servicemember; and (2) vacate or stay an attachment or garnishment . . . whether before or after judgment." *Id.* § 3934(a).

The SCRA defines the relevant terms broadly. Court means "a court or an administrative agency of the United States or of any State (including any political subdivision of a State), whether or not a court or administrative agency of record." *Id.* § 3911(5). Judgment means "*any* judgment, decree, order, or ruling, final or temporary." *Id.* § 3911(9) (emphasis added). As noted above, the SCRA "applies to any judicial or administrative proceeding commenced in any court or agency in any jurisdiction subject to this chapter." *Id.* § 3912(b).

### B.    THE UNIFORM ENFORCEMENT OF JUDGMENTS ACT

The UEFJA applies to "a judgment, decree, or order of a court of the United States or of any other court that is entitled to full faith and credit in this State." Md. Code Ann., Cts. & Jud. Proc. § 11-801. It permits a properly authenticated foreign judgment to be filed with the clerk of the appropriate Maryland state court and directs the clerk to "treat the foreign judgment in the same manner as a judgment of the court in which the foreign judgment is filed." Md. Code Ann., Cts. & Jud. Proc. § 11-802(a)(3). "A filed foreign judgment has the same effect and is subject to the same procedures, defenses, and proceedings for reopening, vacating, staying, enforcing, or satisfying as a judgment of the court in which it is filed." Md. Code Ann., Cts. & Jud. Proc. § 11-802(b). When the judgment creditor files the foreign judgment with the clerk, they must also file an "affidavit showing the name and last known post office address of the judgment debtor," allowing the clerk to "promptly" mail notice of the filing of the foreign judgment to the judgment debtor. Md. Code Ann., Cts. & Jud. Proc. § 11-803(a)–(b).

### 1. *The UEFJA and the SCRA*

The Plaintiffs contend that registering a foreign judgment in Maryland implicates the protections of § 3931 of the SCRA. (ECF No. 49 at 25.) This is not correct. Section 3931 does apply to circumstances where the counterparty does not make an appearance, and judgment debtors do not enter appearances before foreign judgments are registered in Maryland. *See* Md. Code Ann., Cts. & Jud. Proc. § 11-802; 50 U.S.C. § 3931(a). But, the state court does not enter judgment for the plaintiff when registering a foreign judgment, it merely accepts a facially valid and authenticated judgment from a sister state. *See* 50 U.S.C. § 3931(b)(1) ("the court, before entering judgment for the plaintiff, shall require . . .); 50 U.S.C. § 3931(b)(2) (". . . the court may not enter a judgment . . ."). The act of registering a foreign judgment—without more—does not trigger the protections of § 3931 because a court is not "entering judgment for the plaintiff" in those circumstances. While "judgment" is defined broadly under the SCRA, § 3911(9), the language of § 3931 ("for the plaintiff") limits it to only a judgment in favor or for the benefit of the plaintiff. Simply registering the pre-existing judgment is not *for* the plaintiff because no meaningful new or additional benefit is conferred.

This conclusion does not frustrate the purpose of the SCRA. Again, the purpose of the SCRA is to suspend proceedings "that may adversely *affect* the civil rights of servicemembers." *Id.* § 3902(2) (emphasis added). Simply registering a foreign judgment does not confer a significant or additional benefit on the judgment creditor, nor does it materially *affect* the rights of the judgment debtor. The substantive adjudication of the parties' dispute, and any ruling, order, or judgment stemming therefrom already happened in the foreign jurisdiction (here, Texas or Nevada). Indeed, if the judgment is apparently valid then Maryland must give it "full faith and credit." U.S. Const. Art. IV § 1.

11

The Plaintiffs argue to the contrary, saying that because the foreign judgments were void of fraudulent here, they were not entitled to full faith and credit. (ECF No. 49 at 4, 10–16.) This, however, assumes that the state court clerks knew upon receipt that apparently valid and authenticated foreign judgments were, in fact, fraudulent or void. Plaintiffs have pointed to no circumstances that would have so alerted the clerk; indeed their assertion that a lawyer was necessary to point this out undermines their position. (*See id.*) While Plaintiffs may be correct that an actually fraudulent judgment is not entitled to *enforcement*, the Plaintiffs do not explain why an apparently valid judgment must not be given full faith and credit under Article IV of the Constitution. The fact that LeMay allegedly defrauded both the Maryland courts and the Plaintiffs does not undermine the lawfulness of the UEFJA. Accordingly, the Court concludes that nothing in the UEFJA conflicts with or violates the SCRA.

### 2. *Due Process*

Plaintiffs also allege that the UEFJA violates the Due Process Clause because Maryland registers foreign judgments regardless of whether it has personal jurisdiction over the judgment debtors. (*Id.*) Considering this issue under the parallel federal statute, Judge Bennett of this Court recently concluded that "the clear weight of authority provides that no such [personal] jurisdiction is required" over a judgment debtor for a judgment to be registered in this Court. *USCC Distrib. Co. v. G&S Wireless, LLC*, Civ. No. RDB-21-0329, 2021 WL 2315456, at *2 (D. Md. June 7, 2021). While the Parties have not directed the Court to Fourth Circuit precedent on point, Judge Bennett looked to the Eighth and Ninth Circuits, as well as sister Districts in support of his conclusion. *See id.* ("[W]hile there may well be constitutional limitations on registration of judgments under [the parallel federal statute] personal jurisdiction in the court of registration upon the date of registration is not one of them.") (quoting *Ditcher v. Disco Corp.*, 606 F.Supp. 721,

725 (S. D. Ohio 1984)). The Court agrees with Judge Bennett's analysis and review of relevant authority, and the Plaintiffs have offered no reasons why the Court should not do so. In fact, Plaintiffs have offered no authority holding that registering a foreign judgment in absence of personal jurisdiction violates the Due Process Clause. (*See* ECF 49 at 19–23.) Accordingly, a court need not have personal jurisdiction over a judgment debtor to register a foreign judgment.

Having concluded that Plaintiffs' arguments regarding the UEFJA are unavailing, the Court will dismiss all claims insofar as they relate to the UEFJA. Because the UEFJA is the only possible basis for liability for Governor Moore, as the Plaintiffs have not connected him to the creation or enforcement of the Maryland Rules, the Court will also dismiss the claims against him.

## C. MARYLAND RULES

The Maryland court rules implement the foreign judgment registration process described above, providing a process for registering the judgment in the appropriate court. *See* Md. Rule 3-623. After the judgment is registered, the Maryland Rules provide for enforcement mechanisms, which apply to both domestic and foreign judgments. As relevant here, the Maryland Rules provide procedures for garnishing a judgment debtor's assets, including property, accounts, and wages. Md. Rules 3-645, 3-645.1, 3-646. Rule 3-645 provides that the "judgment creditor may obtain issuance of a writ of garnishment by filing in the same action in which the judgment was entered a request that contains (1) the caption of the action, (2) the amount owed under the judgment, (3) the name and last known address of each judgment debtor with respect to whom a writ is requested, and (4) the name and address of the garnishee. *Upon the filing of the request, the clerk shall issue a writ of garnishment directed to the garnishee.*" (emphasis added). A writ of garnishment directs "the garnishee to hold, subject to further proceedings or to termination of the writ, the property of each judgment debtor in the possession of the garnishee at the time of

13

service of the writ and all property of each debtor that may come into the garnishee's possession after service of the writ." Md. Rule 3-645(c)(2). If the garnishee is a financial institution, Rule 3-645.1 also applies, and the writ further directs the garnishee "not to hold property of the judgment debtor that constitutes a protected amount." Md. Rule 3-645.1(d)(1)(A). Rule 3-646 provides additional processes for garnishment of wages. Importantly, regardless of which Rule is at issue, the writ of garnishment is issued before (or regardless of whether) the judgment debtor makes an appearance in the enforcement action.

Similarly, the Maryland Rules provide a subpoena process; the relevant rule governing subpoenas in Maryland District Court is Rule 3-510. It explains when and how subpoenas are issued in Maryland District Court, directing the clerk of court to issue the subpoena by following varying procedures depending on who has made the request. Md. Rule 3-510(b). Importantly, the Rule directs the clerk of court to issue a subpoena without requiring an affidavit regarding whether the subject of the subpoena is an active duty servicemember. *See* Md. Rule 3-510(c). The Rules do not require the party whose information is being subpoenaed to have made any appearance in the action. *See generally* Md. Rule 3-510.[6]

Section 3931 of the SCRA applies in proceedings "in which the defendant does not make an appearance." 50 U.S.C. § 3931(a). And, as discussed above, the requirements of § 3931 are triggered before the court enters a judgment *for* the plaintiff, i.e. adversely affecting the rights of a servicemember defendant. *Id.* §§ 3902, 3931(b).

Judgment debtors, like the Plaintiffs, do not make appearances before writs of garnishment or subpoenas are issued in Maryland. So, § 3931 applies. And both of these enforcement mechanisms fall within the definition of "judgment" under the SCRA, given that the SCRA defines

---

[6] Only the Rileys' information appears to have been subject to a subpoena. (*See* ECF No. 42 ¶¶ 107–16.)

that term to encompass "*any* judgment, decree, order, or ruling, final or temporary." *Id.* § 3911(9) (emphasis added).

The conclusion that the subpoenas and writs of garnishment fall within the SCRA's definition of "judgment" is bolstered by the statute's goal of protecting servicemembers from judicial and administrative proceedings that may affect their rights during their service. A writ of garnishment, which can result in the judgment debtor's assets being frozen, and a subpoena, which can result in disclosure of the judgment debtor's information, both affect the rights of the judgment debtor—here, a servicemember or their spouse. *See Sprinkle v. SB&C Ltd.*, 472 F.Supp.2d 1235, 1245 (W. D. Wash. 2006) (applying the requirements of § 3931 (then § 521) to a garnishment action). Accordingly, the affidavit and attorney appointment requirements of § 3931 are triggered in the circumstances alleged by the Plaintiffs.

Defendants make various arguments to the contrary, none of which are availing. First, they point to the title of § 3931, which reads "[p]rotection of servicemembers against *default* judgments." (emphasis added). But "headings and titles are not meant to take the place of the detailed provisions of the text." *Brotherhood of R.R. Trainmen v. Balt. & O. R. Co.*, 331 U.S. 519, 528–29 (1947) ("[T]he heading of a section cannot limit the plain meaning of the text."); *Miranda v. Garland*, 34 F.4th 338, 355 (4th Cir. 2022) ("While perhaps relevant, a statute's heading is still far less instructive than its actual text."). The text of § 3931 simply refers to a "judgment" when referring to the affidavit and attorney-appointment requirements. 50 U.S.C. § 3931(b). As previously noted, the definition of "judgment" in the SCRA is broad. *Id.* § 3911(9) ("The term 'judgment' means any judgment, decree, order, or ruling, final or temporary.") The use of "any" also dictates breadth, "the word 'any' has an expansive meaning." *Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370, 376 (4th Cir. 2022) (quoting *Ali v. Fed. Bur. of Prisons*, 552 U.S. 214,

219 (2008)). Given the expansive statutory text, the Court cannot conclude that the title limits the meaning in the way Defendants suggest.[7]  Further, while § 3931(b) references judgments generally, § 3931(g) references "default judgments."  Clearly, when Congress intended part of the section to apply only to default judgments, as opposed to judgments generally, they knew how to say so.  The fact that they did not so specify in the relevant portions of § 3931 is significant.

Next, the Defendants argue that the use of "defendant" and "plaintiff," rather than "judgment debtor" and "judgment creditor," in § 3931 forecloses the conclusion that § 3931 applies to garnishment proceedings.  Defendants highlight the term "defendant," which is undefined by the SCRA, and argue that it should be given its "ordinary meaning unless the context suggests otherwise."  (ECF No. 46-1 at 16 (quoting *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 392–93 (4th Cir. 2011).)  But the context does suggest otherwise.  The SCRA must be "liberally construed to protect those who have been obliged to drop their own affairs to take up the burdens of the nation."  *Boone,* 319 U.S. at 575.  The purpose of the SCRA is to protect servicemembers where proceedings "may adversely affect" their civil rights.  50 U.S.C. § 3902(2).  In the context of the statute, such a technically constrained definition of "defendant" does not comport.  By definition, a judgment creditor was, very recently, a plaintiff, and so too the judgment debtor was recently a defendant.[8]  It would obfuscate the purpose of the SCRA if a plaintiff could avoid its requirements simply by taking their judgment elsewhere, transforming themselves into a judgment creditor and obtaining a writ of garnishment.

---

[7] The Parties each make arguments about the legislative history of the SCRA.  (See ECF No. 49 at 11; ECF No. 55 at 6–7.)  However, because precedent and the text of the statute are clear, the Court need not engage in an analysis of the legislative history, which would likely be inconclusive in any case.  *See In re Moore*, 907 F.2d 1476, 1478–79 (4th Cir. 1990).

[8] The Court also notes that the parties to the underlying enforcement actions *are* referred to as "Plaintiff" and "Defendant" on the dockets that Defendants attached as exhibits.  (*See, e.g.,* ECF No. 46-6 at 2.)

For the same reason, Defendants' argument that § 3931 does not apply to garnishment proceedings because, technically, the garnishment action is between the judgment creditor and the garnishee (i.e. financial institution), not the judgment creditor and the servicemember, does not change the Court's conclusion. The true party in interest is the owner, not the holder, of the assets. While it is true that the writ of garnishment is issued against the garnishee, the person whose rights are adversely affected is not the bank, but the person whose assets have been frozen. And these are the exact type of adverse effects the SCRA is intended to protect against. *See* 50 U.S.C. § 3931(d) (providing procedures to stay proceedings where servicemember has not made an appearance); § 3934 (directing courts to "stay the execution of any judgment or order entered against the servicemember" if the servicemember is "materially affected by reason of military service in complying").

Similarly, Defendants' argument that garnishment proceedings are simply "ancillary matters" and therefore not subject to the SCRA is unavailing. (*See* ECF No. 46-1 at 15.) The definition of "judgment" in the SCRA is broad, 50 U.S.C. § 3911(9), and nowhere does it exempt any matters, ancillary or otherwise. Indeed, the only limit on the application of the SCRA is the specific exemption of criminal cases in § 3912(b). Clearly, if Congress had wished to exempt ancillary matters or garnishment proceedings or subpoenas from the requirements of the SCRA, they could have done so in § 3912 but chose not to. This Court cannot read such an exception into the law.

Defendants next contend that the § 3931 requirements cannot apply to garnishment proceedings because the SCRA has a separate section that governs the "[s]tay or vacation of execution of judgments, attachments, and garnishments," § 3934. (ECF No. 46-1 at 15.) Section 3934, however, undermines Defendants' position. As discussed above, § 3934 allows or directs

courts to stay the execution of a judgment if a servicemember "is materially affected by reason of military service in complying" with the judgment. 50 U.S.C. § 3934(a). The court *shall* do so on application by the servicemember and *may* do so on its own motion. *Id.* These protections, however, are meaningless if the court is not already aware that the judgment debtor is a servicemember or otherwise protected by the SCRA. This section of the SCRA presumes a court's knowledge about a defendant's status as a servicemember. How can a court "on its own motion" stay a writ of garnishment because the garnishment would "materially affect[]" a servicemember if the court is unaware that there is a servicemember is involved? Defendants' interpretation of the SCRA would permit a judgment creditor to avoid entirely the protections of the SCRA by obtaining a judgment in one court and then simply registering it elsewhere so that the enforcing court will unknowingly fail to comply with the SCRA.

Defendants next contend that Congress could have explicitly provided for an affidavit and appointment of counsel in § 3934, because they did in § 3931, and so the omission must be intentional. This argument misreads the structure of the statute. As noted above, the protections of § 3934 are rendered impotent if the court does not already know that the judgment creditor is a servicemember. Section 3934 assumes that either (1) the servicemember has made an appearance and is thus able to advocate on their own behalf (therefore not implicating § 3931); or (2) that the requirements of § 3931 have already been followed and the court is aware that the judgment debtor is a servicemember. Here, because the Maryland courts did not comply with § 3931, they were unable to consider *sua sponte* whether the writs of garnishment or subpoenas should be stayed.

Defendants further argue that complying with § 3931 when enforcing a foreign judgment will prevent them from giving full faith and credit to the foreign judgment as required by the constitution. (ECF No. 46-1 at 16.) They do not, however, explain how. Requiring an affidavit

and perhaps appointing an attorney does not require the parties to relitigate the merits of the underlying case nor does it invalidate the foreign judgment. It simply vindicates rights under the SCRA, in the same way as would take place if the foreign judgment were enforced in its originating jurisdiction.

Lastly, the defendants argue that applying § 3931 of the SCRA to the enforcement of foreign judgments involving garnishment and subpoenas will "upend decades of law and practice throughout the country." (ECF No. 46-1 at 5.) The Court is mindful and respectful of the dignity of the Maryland courts, and of state courts around the country. While ramifications cannot overcome this Court's interpretation of the plain language, the Court has nonetheless carefully considered the ramifications of this opinion and is confident they are very limited. Indeed, they are not disruptive at all. Nationwide practices are not before this Court; the dispute here is about three couples who ended up in court in Maryland. Moreover, as discussed below, the Plaintiffs do not have standing to pursue prospective relief, and nothing in this opinion will require the Maryland courts to change their practices.

Further, even if this Court could order compliance with the SCRA, the requirements are not onerous. To comply with § 3931, a court need only require an affidavit as described in § 3931(b) and appoint an attorney if the servicemember does not make an appearance. The affidavits would be provided by the judgment creditors, not the court. And only in very rare circumstances would a court need to appoint counsel. Congress, in enacting the SCRA, determined that this minor burden on the courts is necessary to allow servicemembers to "devote their entire energy to the defense needs of the Nation." *See* 50 U.S.C. § 3902(1). Indeed, as the Supreme Court noted in *Conroy v. Aniskoff*, the SCRA reflects a "deliberate policy judgment placing a higher value on firmly protecting" certain servicemember rights relative to minor burdens on a state tax collection

19

process. 507 U.S. 511, 517–18 (1993). The entirely hypothetical burdens presented here are similarly minor. This Court, and the Maryland state courts, are bound to respect that Congressional determination.

Accordingly, the Court concludes that Maryland's garnishment and subpoena procedures, as prescribed by the Maryland Rules, implicate § 3931 of the SCRA, assuming the defendant/judgment debtor is a servicemember (or otherwise protected by the SCRA) and has not made an appearance.[9] The Plaintiffs have alleged that none of the relevant Maryland courts required affidavits or appointed attorneys before issuing writs of garnishment or subpoenas adversely affecting them. Accordingly, the Plaintiffs have alleged a violation of the SCRA.

### D.    RELIEF SOUGHT

Having concluded that Plaintiffs have stated a claim under the SCRA, the Court will now turn to the relief sought. Plaintiffs seek "a preliminary and permanent injunction" preventing Maryland from issuing or enforcing judgments (as defined by the SCRA) if there has not been compliance with the SCRA; "a preliminary and permanent injunction" requiring Maryland to expunge judgments against the Plaintiffs from its public records; "Declarations of Law" stating that the SCRA preempts Maryland law and that judgments obtained in violation of the SCRA are unenforceable; judgments of liability in their favor; actual damages; and attorney's fees. (ECF No. 42 at 55–56.)

The Court will first address the Plaintiffs' cause of action (or lack thereof). Then the Court will consider Defendants' argument that the Plaintiffs' lack standing.[10]

---

[9] At least one other federal court has agreed that the SCRA is applicable to garnishment proceedings. *See Sprinkle*, 472 F.Supp.2d 1235, 1244–45. Neither Party has identified controlling authority regarding this question. Defendants' attempt to distinguish *Sprinkle* by pointing out that it did not involve a foreign judgment. (ECF No. 55 at 9.) They do not, however, identify any part of the SCRA exempting foreign judgments from its requirements.

[10] Because the Court has concluded that there is no Due Process violation alleged, the Court will not further consider standing related to the Due Process Clause nor whether any cause of action exists for a Due Process claim here.

## 1. *Cause of Action*

The Plaintiffs proffer the SCRA and the Supremacy Clause as causes of action in their Amended Complaint. (ECF No. 42 at 49.) The Supremacy Clause, however, "does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325 (2015). The Supremacy Clause merely "instructs courts what to do when state and federal law clash." *Id.* It is "silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* While this Court can "grant injunctive relief against state officers who are violating, or planning to violate, federal law," such a power does not rest "upon an implied right of action contained in the Supremacy Clause." *Id.* at 326–27. Accordingly, the Plaintiffs may not proceed under the Supremacy Clause.

The SCRA, on the other hand, does have a private right of action, § 4042: "[a]ny person aggrieved by a violation of this chapter may in a civil action (1) obtain any appropriate equitable or declaratory relief with respect to the violation; [and] (2) recover all other appropriate relief, including monetary damages." The Defendants argue, however, that this private right of action is intended only for use against judgment creditors, not against other violators of the SCRA, like judges or court employees. (ECF No. 46-1 at 8–9.) They offer scant argument in favor of this position and do not point out any limiting language in the law. (*Id.*) Accordingly, the Plaintiffs may bring suit against the Defendants under § 4042 of the SCRA.

The Court will next consider whether the Plaintiffs have standing to pursue the relief they seek, examining each type of requested relief in turn.

## 2. *Injunctive Relief*

Plaintiffs do not have standing to seek injunctive relief. A plaintiff seeking injunctive relief must show "that he is in danger of being injured by the opposing party's conduct and that the

danger is both 'real' and 'imminent' and neither 'conjectural' or 'hypothetical.'" *Gardner v. Montgomery Cnty. Tchrs. Fed. Credit Union*, 864 F.Supp.2d 410, 421 (D. Md. 2012) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). "[P]ast exposure to illegal conduct does not in itself show a present case or controversy." *Id.* "Plaintiffs bear the burden of establishing standing." *S. Walk at Broadlands Homeowners's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 181 (4th Cir. 2013) (citation omitted).

Plaintiffs have not carried their burden. Plaintiffs have not, and could not have, pled imminent harm. For the State of Maryland to again violate Plaintiffs' rights under the SCRA, another individual would have to obtain foreign judgments against them, then register and seek to enforce the judgments in Maryland. Then, the Maryland courts would again have to violate the SCRA regarding the enforcement of the judgments. And, all of this would have to take place while the Plaintiffs are still active duty servicemembers or dependents thereof. This chain of events is far too attenuated to provide standing for injunctive relief. That Plaintiffs will ever again be impacted by garnishment proceedings after the registration of a foreign judgment in Maryland is unquestionably both conjectural and hypothetical. Plaintiffs do not have standing to pursue prospective injunctive relief.

Plaintiffs' conclusory statement, that "[u]nless the State of Maryland is enjoined, Plaintiffs and others will suffer irreparable harm and be unlawfully denied the protections they are entitled under the law" is unavailing. (*See* ECF No. 42 ¶ 180.) This statement contains no specifics; it does not explain how the Plaintiffs will end up in this scenario, or any similar situation, ever again. Nor are the references to "more than twenty similar matters in Maryland state courts" in which similar events have allegedly taken place. (ECF No. 42 ¶ 36.) Whether or not Maryland courts have violated the SCRA as to others has nothing to do with the risk to these Plaintiffs. The

22

Plaintiffs are not representing a class, they themselves must have standing for injunctive relief. Accordingly, Plaintiffs' claim for injunctive relief will be dismissed.[11]

### 3. *Declaratory Relief*

"The standing requirements for declaratory relief and injunctive relief are essentially the same." *Gardner,* 864 F.Supp.2d at 421. Accordingly, for the same reasons that Plaintiffs do not have standing to seek injunctive relief, they do not have standing to seek declaratory relief, and their claim for declaratory relief will be dismissed.

### 4. *Damages*

Plaintiffs do, however, have standing to seek damages. The "irreducible constitutional minimum of standing" requires (1) "an injury in fact—a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical;" (2) "causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant;" and (3) "redressability—a likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102–03 (1998) (quotations and citations omitted). Whether a plaintiff has standing does not turn on the merits of that plaintiff's claim but rather on whether the "plaintiff is the proper party to bring the suit." *White Tail Park, Inc. v. Stroube,* 413 F.3d 451, 460 (4th Cir. 2005) (cleaned up) (quotation omitted).

Taking Plaintiffs' allegations as true, they have standing to pursue damages. Plaintiffs have suffered injury in fact—their assets were frozen, leading to loss of interest on certain accounts (ECF No. 42 ¶¶ 75a, 127a, 160a); they suffered a loss of reputation (*id.* ¶¶ 75b, 127b, 160b); they suffered emotional distress (*id.* ¶¶ 75c, 127c, 160c); and they were forced to pay legal fees to

---

[11] Because the Court concludes that the Plaintiffs do not have standing to seek prospective relief, the Court need not consider whether the Plaintiffs would otherwise satisfy the pleading requirements of *Ex parte Young.* 209 U.S. 123 (1908).

defend the garnishment actions (*id.* ¶¶ 75d; 127f, 160e). The injury is fairly traceable to the Defendant Justices' conduct. While it was LeMay who brought the action, it was the Maryland Courts, overseen by the Justices, who issued the writs of garnishment and subpoenas. As Defendants note, "*[e]nforcement* of a money judgment may only be had in accordance with the Maryland Rules and statutes." (ECF No. 46-1 at 18 (emphasis added) (citing Md. Rules 2-631, 3-631).) The Plaintiffs allege that the Justices are "vested with the authority to supervise, manage, and control" Maryland's judicial branch. (ECF No. 56 at 23.) Had the Defendant Justices used their authority to require clerks to comply with § 3931 of the SCRA, then the Plaintiffs' rights under the SCRA would have been protected and clerks would not have issued writs of garnishment and subpoenas to enforce fraudulent judgments. Lastly, Plaintiffs harms are redressable. Monetary damages are a traditional remedy where the plaintiff has suffered financial and emotional hardship, and the SCRA expressly provides for them.

Taking their allegations as true for the purpose of the Motion to Dismiss, Plaintiffs have carried their burden to demonstrate that they have standing to pursue damages.

### E.    DEFENDANTS' ARGUMENTS

Defendants raise various defenses, which would divest this Court of jurisdiction or otherwise bar Plaintiffs' claims, and the Court will consider them in turn. To the extent the Court has already determined that particular claim is not viable, the Court will not consider the impact of Defendants' arguments on those nonviable claims. Plaintiffs bear the burden of demonstrating that this Court has jurisdiction to hear their claim. *See Sullivan v. Gen. Helicopters, Int'l*, 564 F.Supp.2d 496, 498 (D. Md. 2008). Where Defendants "seek exemption from personal liability" they "have the burden of showing that such an exemption is justified by overriding considerations of public policy." *Forrester v. White*, 484 U.S. 219, 224 (1988). When considering whether

Plaintiffs' claim should be dismissed, the Court will take their factual allegations as true and draw reasonable inferences in their favor. *Ibarra*, 120 F.3d at 474.

### 1.    *Rooker-Feldman*

Defendants contend that Plaintiffs' claims are "inextricably intertwined with the State court decisions in LeMay's underlying three cases with Plaintiffs (both in the State [of Maryland] and the originating jurisdictions) and the *Rooker-Feldman* doctrine bars Plaintiffs' request for redress in this Court." (ECF No. 46-1 at 35.)

The *Rooker-Feldman* doctrine provides that federal courts do not have jurisdiction to overturn state court decisions. *Dist. Of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462, 476 (1983); *Rooker v. Fidelity Tr. Co.*, 263 U.S. 413, 416 (1923). It blocks claims in which plaintiffs simply seek "the equivalent of an appellate review of the state court order." *Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 202 (4th Cir. 1997) (cleaned up) (quotation omitted). It is confined to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

*Rooker-Feldman* does not apply here. Defendants' argument to the contrary misunderstands the nature of Plaintiffs' claims. Plaintiffs are not attacking the substance of the writs of garnishment or subpoenas issued by the Maryland courts or judgments issued by the other state courts in the underlying matters. The underlying matters have been entirely resolved in Plaintiffs' favor—the Plaintiffs are not "state-court losers." Rather, Plaintiffs challenge the *process* by which the Maryland state courts issued those writs and subpoenas. They are not asking this Court to review the substance of the judgments themselves. They are asking this Court

whether, in issuing the writs of garnishment and subpoenas, there was a violation of the SCRA for which the Defendants can be held liable. Accordingly, the *Rooker-Feldman* doctrine does not mandate dismissal of the Plaintiffs' damages claim here.

However, the Plaintiffs have also asked this Court to direct the State of Maryland to expunge the lower court records. (ECF No. 42 at 55.) This Court is mindful of *Rooker-Feldman*'s admonition against taking "action that would render the [state court] judgment ineffectual." *See Jordahl*, 122 F.3d at 202. Further, generally, all state appellate remedies must be exhausted before a federal court can intervene in a state judicial proceeding. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 609 (1975). Plaintiffs have not alleged that they made any attempt in state court to have the records expunged before turning to federal court. Accordingly, to the extent the Plaintiffs seek an order requiring the Defendants to expunge state court records, this Court lacks jurisdiction to make such an order and such claim for relief will be dismissed.

### 2. *Sovereign Immunity*

Defendants argue that Plaintiffs' suit against them in their official capacities is barred by sovereign immunity under the Eleventh Amendment. (ECF No. 46-1 at 24–25.) Defendants are correct that, usually, Congress must "unequivocally" abrogate sovereign immunity or the state must waive it. *See Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001); *Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30, 35 (2012). They also correctly aver that Maryland has not waived its sovereign immunity under the SCRA, nor did Congress abrogate it. (ECF No. 46-1 at 25–26.) This, however, assumes that any sovereign immunity exists to be waived or abrogated. When it comes to suits pursuant to the SCRA, there was never any sovereign immunity to begin with.

26

The Eleventh Amendment, rooted in principles of sovereign immunity, bars suits against unconsenting states brought in federal courts by private parties. *See Lee-Thomas v. Prince George's Cnty. Pub. Schs.*, 666 F.3d 244, 248 (4th Cir. 2012). This same proscription applies to suits against instrumentalities of the state and state officials acting in their official capacities, as here. *See Francis v. Maryland*, Civ. No. ELH-21-1365, 2023 WL 2456553, at *12 (D. Md. Mar. 10, 2023) (collecting cases).

There are three circumstances in which a State's sovereign immunity does not bar a private party's suit: (1) where the State has waived its Eleventh Amendment immunity and consented to suit; (2) where Congress has abrogated the States' Eleventh Amendment Immunity pursuant to a valid grant of constitutional authority; or (3) where the States "agreed their sovereignty would yield as part of the 'plan of the Convention'"—that is, "if 'the structure of the original Constitution itself' reflects a waiver of States' immunity." *Torres v. Texas Dep't of Pub. Safety*, 597 U.S. 580, 587 (2022) (quoting *PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 2244, 2263 (2021) and *Alden v. Maine*, 527 U.S. 706, 728 (1999)).[12] The third circumstance is relevant here.

In *Torres*, the Supreme Court considered whether the State of Texas could assert sovereign immunity as a defense to a private citizen's lawsuit brought under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4301 *et seq.*, which "gives returning veterans the right to reclaim their prior jobs with state employers and authorizes suit if those employers refuse to accommodate them." 597 U.S. at 584. The Supreme Court held that Texas could not. *Id.* at 590. The Court applied its test for "structural waiver," first announced in *PennEast Pipeline Company LLC v. New Jersey*, to determine whether Congress's

---

[12] The *Ex Parte Young* exception to sovereign immunity also allows private citizens to sue State officials "in their official capacities in federal court to obtain prospective relief from ongoing violations of federal law." *Allen v. Cooper*, 895 F.3d 337, 354 (4th Cir. 2018). However, because the Court has already determined that Plaintiffs do not have standing to seek prospective relief, that exception is not relevant here.

"power to build and maintain the Armed Forces" is "'complete in itself'" and whether "the States consented to the [federal] exercise of that power[,] in its entirety.'" *Id.* at 589–90 (quoting *PennEast*, 141 S. Ct. at 2263).

The Supreme Court determined that Congress enacted USERRA as part of its power "to raise and support Armies" and "to provide and maintain a Navy." *Id.* at 584 (quoting U.S. Const., art. I, § 8, cls. 12–13). The Supreme Court concluded that "Congress' power to build and maintain the Armed Forces fits *PennEast*'s test. The Constitution's text, its history, and this Court's precedents show that when the States entered the federal system they renounced their right to interfere with national policy in this area." *Id.* at 590 (quotation omitted). As such, when States are sued by private citizens under federal statutes enacted pursuant to Congress's War Powers, they "*simply have no immunity left to waive or abrogate.*" *Id.* at 589 (emphasis added) (citation and quotation omitted).

*Torres* is dispositive on the question of sovereign immunity when it comes to the SCRA. The holding of Torres is clear, and it is broad: "We . . . hold that, as part of the plan of the Convention, the States waived their immunity under Congress' Article I power '[t]o raise and support Armies' and 'provide and maintain a Navy.'" *Id.* at 594 (quoting U.S. Const., Art. I, § 8, cls. 12–13). The SCRA was unambiguously enacted pursuant to Congress's War Powers. 50 U.S.C. § 3902(1) (purpose of the SCRA is to "provide for, strengthen, and expedite the national defense through protection extended by this chapter to servicemembers of the United States"). Maryland cannot assert an immunity today that it waived when it ratified the Constitution in 1788. Further, Congress need not abrogate an immunity that simply does not exist. *Torres*, 597 U.S. at 589. After *Torres*, Defendants may not assert sovereign immunity as a defense to private SCRA litigation, and Plaintiffs' SCRA claim is not barred on that ground.

28

Defendants try to avoid *Torres* on several grounds. First, Defendants point out that *Torres* was about USERRA, not about the SCRA. (ECF No. 46-1 at 26.) They are correct that Texas's violation of USERRA brought Torres to court in the first place. But to characterize the *Torres* holding as applying only to USERRA is to misunderstand it. As explained above, in deciding *Torres*, the Supreme Court applied the *PennEast* test, which asks whether the "federal power at issue is complete in itself." *Torres*, 597 U.S. at 589. The *PennEast* test does not look to the text of the statute authorizing suit against a state, rather it investigates the Constitution's text, structure, and history to determine whether the states yielded their sovereignty in a particular arena as part of the constitutional plan. *Id.* at 589–90. Conducting that investigation in *Torres*, the Court concluded that "when the States entered the federal system, they renounced their right to interfere with" "Congress' power to build and maintain the Armed Forces." *Id.* (quotation omitted). That holding is about Congress's power not just to enact USERRA, but to enact laws generally to "raise and support Armies" and "provide and maintain and Navy." *Id.* at 594 (quoting U.S. Const. Art. 1 § 8 cls. 12–13).

For similar reasons, Defendants' attempt to distinguish the SCRA from USERRA because the SCRA does not "expressly supersede[] any State law," is unavailing. (*See* ECF No. 46-1 at 27.) First, federal law always supersedes state law, as Plaintiffs' references to the Supremacy Clause remind us. (*See* ECF No. 49 at 38); *Torres*, 597 U.S. at 595 ("Under Supremacy Clause principles, Texas courts may not enforce contrary state laws to block these suits."). Second, while USERRA does expressly provide for relief against states, as Defendants point out (ECF No. 46-1 at 28), that provision is not necessary to the holding of *Torres*. *Torres* does not mention USERRA's express authorization of suits until it addresses the dissent's (and Texas's) arguments. 597 U.S. at 595. In any case, the SCRA does explicitly apply to "each of the States, including the

political subdivisions thereof" and "to any judicial or administrative proceeding commenced in any court or agency in any jurisdiction subject to this chapter." 50 U.S.C. § 3912(a)–(b).

Defendants' abrogation and waiver arguments are similarly misplaced. (*See* ECF 55 at 25–26.) When it comes to "Congress' power to build and maintain the Armed Forces," Maryland, like the rest of the states, "simply [has] no immunity left to waive or abrogate." *See Torres*, 597 U.S. at 589–90. So, while Defendants argue that abrogation cannot be read into the SCRA (ECF No. 55 at 25), they miss the crux of the issue because Congress need not abrogate something that does not exist. For the same reason, contrary to Defendants' assertion (*id.* at 25–26), this Court need not apply the "stringent" waiver test to determine whether Maryland waived its immunity. Maryland can neither assert nor waive an immunity that does not exist. When concluding in *Torres* that the states all waived their sovereign immunity centuries ago, the Supreme Court did not mention whether some further express or unequivocal statement is needed from the states today. Adding such an additional limit on Congressional power would defy the logic of *Torres* and would certainly be beyond the power of this Court.[13]

Lastly, Defendants try to differentiate USERRA from the SCRA by asserting that there is no risk to military readiness posed by SCRA violations. (ECF No. 46-1 at 29.) This conclusion is highly debatable, as Plaintiffs have alleged that they had to take time to defend their rights in Maryland, which the Court can infer prevented them from devoting "their entire energy to the defense needs of the Nation." (*See* ECF No. 42 ¶ 71); 50 U.S.C. § 3902(1). But in any case, it is not for the Defendants to decide what does or does not impede the national defense, nor is it for this Court. That power is vested in Congress. *See Torres*, 597 U.S. at 584 (citing U.S. Const. Art.

---

[13] Defendants cite to two cases holding that sovereign immunity bars actions against states under the SCRA, *Webb v. California*, No. CV 17-8499-DMG (KSx), 2018 WL 6184776 (C.D. Cal. Mar. 15, 2018) and *Hofelich v. Hawaii*, Cv. No. 11-00034 DAE BMK, 2011 WL 2117013 (D. Haw. May 25, 2011). (ECF No. 46-1 at 24–26.) Both of these unpublished and out of circuit cases, however, were decided before *Torres*.

I, § 8, cls 1, 12–13). Congress has determined that the SCRA is necessary to "provide for, strengthen, and expedite the national defense through protection extended by this chapter to servicemembers of the United States to enable such persons to devote their entire energy to the defense needs of the Nation." 50 U.S.C. § 3902. Neither this Court nor the Defendants can ignore that determination.

Accordingly, Defendant may not assert sovereign immunity as a bar to suit under the SCRA.

### 3. *Judicial Immunity*

Defendants argue that "absolute and quasi-judicial" immunity bars Plaintiffs' claims. (ECF No. 46-1 at 31.) Judges "are not liable to civil actions for their judicial acts." *Stump v. Sparkman*, 435 U.S. 349, 355–56 (1978). Judicial immunity is intended to discourage "collateral attacks" by directing efforts to correct "judicial error" to appellate procedures and to protect "judicial independence by insulating judges from vexatious actions prosecuted by disgruntled litigants." *Forrester*, 484 U.S. at 225 (1988). However, this immunity only protects *judicial* tasks, when a judge acts in a non-judicial capacity, they receive no such immunity. *See id.* at 227 ("Difficulties have arisen primarily in attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges."). "Administrative decisions, even though they may be essential to the very functioning of the courts, have not similarly been regarded as judicial acts." *Id.* at 228. Courts are "quite sparing" in recognizing "claims to absolute official immunity." *Id.* at 224.

The Defendant Justices are not entitled to judicial immunity here. Plaintiffs have not sued the Justices because they actually adjudicated the underlying disputes with LeMay. Rather, Plaintiffs have sued the Justices for their role in promulgating and enforcing the Maryland Rules,

31

which violate the SCRA. These are not "truly judicial acts" like those "involved in resolving disputes between parties" but rather "acts that simply happen to have been done by judges." *See Id.* at 227 (holding that "supervising court employees and overseeing the efficient operation of a court" are administrative tasks not entitled to judicial immunity).

The Court also notes that the Defendants' arguments are contradictory, undermining their position. The Defendants describe the processing of foreign judgments as "ministerial," without any adjudication of the dispute between the parties. (ECF No. 55 at 14.) They make this point to avoid the Court's conclusion above, that the writs of garnishment and subpoenas were "judgments" as defined by the SCRA. Yet, they simultaneously argue that the clerks who processed the writs and subpoenas here are entitled to judicial immunity. (ECF No. 46-1 at 32–33.) Defendants cannot have it both ways.[14]

Accordingly, the Defendants are not entitled to judicial immunity as to the Plaintiffs' SCRA claim.

---

[14] The Court notes that Defendants appear to offer the court clerk as a potential defendant because they actually issued the writs of garnishment and subpoenas here. (ECF No. 55 at 20.) But the Defendants also argue that "court clerks are entitled to judicial immunity when performing tasks that are integral to the judicial process." (ECF No. 46-1 at 32 (cleaned up) (quoting *D'Aoust v. Diamond*, 424 Md. 549, 599 (Md. 2012)).) Having concluded above that Plaintiffs' rights under the SCRA have been violated, the Court is concerned that it is the Defendants' position that Maryland courts, which the Justices oversee, can violate federal law in perpetuity with no consequences, either prospective or retrospective. (*See* ECF No. 46-1 at 32–33 (arguing that "[r]egardless of who Plaintiffs sue, the State is entitled to absolute judicial immunity for anyone who may purportedly be responsible for the alleged violations of the SCRA in Maryland as Plaintiffs have plead [sic] them (whether through the actions of [Maryland State] District Court Judges, District Court clerks, or otherwise).").) As the Supreme Court has said, "[m]ost judicial mistakes or wrongs are open to correction through ordinary mechanisms of review, which are largely free of the harmful side-effects inevitably associated with exposing judges to personal liability." *Forrester*, 484 U.S. at 227. The Court makes no determination on liability today, nor on whether this suit is, in the end, a proper vehicle to redress the wrongs identified above. However, because judicial immunity relies, at least in part, on the availability of other methods of review, the Court is particularly reluctant to find it applicable where the Defendants have not identified any other mechanism of redress. This is particularly true in the context of the SCRA, the purpose of which is to allow servicemembers "to devote their entire energy to the defense needs of the Nation;" a purpose that was undermined as soon as the Plaintiffs were forced to devote some of their energy to the underlying actions in Maryland. *See* 50 U.S.C. § 3902(1).

### 4. *Legislative Immunity*

Lastly, Defendants argue that Plaintiffs' claims arise "out of the law/rule-making or legislative duties" of the Justices and that therefore the "Defendants are entitled to immunity for such claims." (ECF No. 46-1 at 29.) "The purpose of [legislative] immunity is to insure that the legislative function may be performed independently without fear of outside interference." *Supreme Ct. of Va. v. Consumers Union, Inc.*, 446 U.S. 719, 731 (1980) (citation omitted). To this end, legislative immunity is jurisdictional, protecting defendants "engaged in the sphere of legitimate legislative activity . . . not only from the consequences of litigation's results but also from the burden of defending themselves." *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967) (internal citation and quotations omitted). "Officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions." *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998). Legislative immunity protects acts such as voting for or against an ordinance, signing something into law, and other steps "integral" to the legislative process. *See id.*

In support of their position, the Defendants direct the Court to *Supreme Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719 (1980). (ECF No. 46-1 at 30.) In *Consumers Union*, the Supreme Court held that the justices of the Virginia Supreme Court were immune from suit when acting pursuant to their delegated legislative authority to govern the legal profession in Virginia. *Id.* at 734. The *Consumers Union* Court, observing that Virginia state law "vested in the court virtually [the State's] entire legislative or regulatory power over the legal profession," held that "the Virginia Court and its members are immune from suit when acting in their legislative capacity." *Id.* at 722, 734.

The Justices here are similarly "exercising the State's entire legislative power" in promulgating the Maryland Rules. Maryland's Constitution provides that its Supreme Court "shall

33

adopt rules and regulations concerning the practice and procedure in and the administration of the appellate courts and in the other courts of this State, which shall have the force of law until rescinded, changed or modified by the Supreme Court of Maryland or otherwise by law." Md. Const., Art. IV, § 18(a). Accordingly, insofar as the Justices are acting within the "sphere of legitimate legislative activity," they are protected by absolute immunity from suit. *Dombrowski*, 387 U.S. at 85. Such activity includes promulgating the Maryland Rules.

In *Consumers Union*, however, the Supreme Court also held that "the Virginia Court and its chief justice properly were held liable in their enforcement capacities." *Consumers Union*, 446 U.S. at 736.[15] There, the Virginia Supreme Court had an "inherent power to discipline attorneys" and could *sua sponte* "issue a rule to show cause against [an] offending attorney." *Id.* at 724. So, even if the promulgation (i.e. the development and adoption) of the Maryland Rules is protected by legislative immunity, the execution, enforcement, and administration of those Rules is not. Plaintiffs' have not sued the Justices merely based on the *promulgation* of the Maryland Rules. The Plaintiffs also object to actions taken pursuant to those Rules, actions that this Court has already determined violated the SCRA. Plaintiffs argue that the Justices have "some connection to enforcement" and note that the Chief Justice is the "administrative head of the Judicial system of the state." (ECF No. 49 at 30, 44 (citing Md. Const. Art. IV § 18(b)(1)).)[16]

Where the Plaintiffs' allegations extend past the adoption of the Maryland Rules and object to actions taken pursuant to those rules, the Court is mindful of the line drawn in *Consumers Union* and on the Supreme Court's admonition in *Forrester* not to "extend the scope" of legislative

---

[15] There, the Supreme Court reasoned that because the Virginia Court had "independent authority of its own to initiate proceedings against attorneys" it could be sued for declaratory and injunctive relief, "just as other enforcement officers and agencies were." *Consumers Union*, 446 U.S. at 736. Damages, the only form of relief surviving here, are not addressed vis à vis the enforcement capacity.

[16] The Defendants dispute this and aver throughout their motion to dismiss that they "had no involvement" with the Plaintiffs. (*See, e.g.*, ECF No. 46-1 at 11–12.) However, this appears to be a factual dispute, which the Court cannot resolve in considering Defendants' Motion to Dismiss.

immunity "further than its purposes require." 484 U.S. at 223–24 ("Aware of the salutary effects that the threat of liability can have, however, as well as the undeniable tension between official immunities and the ideal of the rule of law, this Court has been cautious in recognizing claims that government officials should be free of the obligation to answer for their acts in court.").

"Actions that are administrative or executive in nature are not afforded the protections of legislative immunity." *EEOC v. Washington Suburban Sanitary Com'n*, 666 F.Supp.2d 526, 532 (D. Md. 2009). Like in *Consumers Union*, both the legislative and executive functions with respect to the Maryland Rules are vested in the Justices. While acting pursuant to their legislative (or judicial) power, the Justices are immune. When they act pursuant to some other authority, however, they are not. To determine where the line is, the Court must look to the character of the act. "The essential factor leading to an application of legislative immunity is whether the action has broad, more general, policy implications or merely 'singles out specifiable individuals.'" *Id.* at 533 (quoting *Alexander v. Holden*, 66 F.3d 62, 65 (4th Cir. 1995)). While the promulgation of the Maryland Rules was general, their application to the Plaintiffs here was specific.

Indeed, the Justices admit that the power of the Maryland courts goes beyond legislative or adjudicative power. As Defendants note, "[e]nforcement of a money judgment may only be had in accordance with the Maryland Rules and statutes." (ECF No. 46-1 at 18 (citing Md. Rules 2-631, 3-631).) While the creditor is the person seeking enforcement, the Maryland courts provide the mechanism and authority for such enforcement. They issue subpoenas and writs of garnishment which carry the force of law and compel obedience. The Defendant Justices are sued "in their official capacities as the officers of the State of Maryland responsible for carrying out and executing the laws and rules subject to this action." (*Id.* ¶ 29.) The Plaintiffs argue that the Justices are "vested with the authority to supervise, manage, and control" Maryland's judicial branch.

35

(ECF No. 56 at 23.) They also have "the authority to appoint and supervise the Administrator of the Administrative Office of the Courts for management of the judicial system including but not limited to reporting on the business conducted by the courts across the state." (ECF No. 42 ¶ 29.)

Accordingly, while the Justices cannot be held liable for acting in their legislative capacity and promulgating the Maryland Rules, the Court cannot conclude as much with respect to any role the Justices may play with respect to the enforcement of the Rules. At this stage of the litigation, and on the allegations provided by the Plaintiffs, legislative immunity does not completely bar Plaintiffs' claim and so the Defendants' Motion to Dismiss will be denied in part. Plaintiffs' mere allegations regarding the Justices' enforcement role are, however, insufficient to carry their burden on summary judgment. Thus, in short, Defendants have failed to show that legislative immunity entirely bars Plaintiffs' claim and Plaintiffs have failed to proffer sufficient evidence demonstrating, for summary judgment purposes, Defendants' liability. Plaintiffs have stated a claim upon which relief *may* be granted, no more.

Immunity from suit is not the norm. As discussed above, it is a deviation from the general principle that if someone has been wronged, then they can seek legal redress. The Court is mindful of its burden to appropriately wield absolute immunity only so far as allowed. The gravamen of the Parties' arguments was not focused on legislative immunity or whether the Justices can be held liable in their enforcement or administrative capacities. The boundaries of legislative immunity relative to actions allegedly taken in this scenario have not been fully litigated. The Court is left with more questions than answers, making summary disposition inappropriate.

## IV. CONCLUSION

To summarize, for the foregoing reasons, the Court concludes (1) that the protections of § 3931 of the SCRA were triggered by the writs of garnishment and subpoenas in Maryland state

court; (2) that claims related to the UEFJA and Supremacy Clause will be dismissed; (3) that the claims against Governor Moore will be dismissed from this case; (4) that the Plaintiffs do not have standing to pursue declaratory or injunctive relief; (5) that neither the *Rooker-Feldman* doctrine, nor sovereign immunity, nor judicial immunity bar Plaintiffs' damages claim; (6) that this Court does not have jurisdiction to order that any state court records be expunged; and (7) that legislative immunity bars Plaintiffs' claim only to the extent that the Justices acted in their legislative capacity, and no farther. The Parties will be directed to meet and confer regarding the remaining disputes and file a joint submission   outlining the Parties' respective positions on (1) whether it is necessary to engage in discovery, and (2) whether either Party wishes to move for further summary disposition. The Court will refer the Parties to a magistrate judge for a further settlement conference.

DATED this __20__ day of March, 2024.

BY THE COURT:

_____
James K. Bredar
Chief Judge