## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **LATASHA ROUSE, et al.,** | * | |
| **Plaintiffs,** | * | |
| v. | * | **Civ. No. JKB-22-0129** |
| **MATTHEW FADER, et al.,** | * | |
| **Defendants.** | * | |
| | * | |

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

### MEMORANDUM

Now before the Court are Plaintiffs' Motion for Leave to File Second Amended Complaint ("Motion for Leave to Amend"), (ECF No. 72), and Defendants' Motion for Summary Judgment, (ECF No. 73). The motions are fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2023).

For the reasons below, Defendants' Motion for Summary Judgment will be granted and Plaintiffs' Motion for Leave to Amend will be denied. A separate order will issue to effectuate this decision.

## I.    BACKGROUND

From its inception, this case has focused largely on allegations that Defendants, a rotating cast of Maryland state officials, failed adequately to protect the interests of Plaintiffs—three married couples, each with one spouse who, at all relevant times, was on active-duty military service—by allowing judicial process to run against them, contrary to various legal safeguards for active-duty servicemembers. Among these safeguards is the Servicemembers Civil Relief Act ("SCRA"), which "provide[s] for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during

their military service." 50 U.S.C. § 3902(2); *see generally id.* §§ 3901–4043. After nearly three

years of litigation in this Court, Plaintiffs' case is substantially narrowed, such that the SCRA is

the only remaining source of rights Plaintiffs allege to have been violated.

The prelitigation facts and early procedural history are set out at length in the Court's

Memorandum dated March 20, 2024. *See* (ECF No. 58 at 3–8), *reproduced as Rouse v. Moore*,

Civ. No. JKB-22-0129, 2024 WL 1216475, at *2–4 (D. Md. Mar. 20, 2024). An abridged version

follows below, along with a brief account of the most recent developments in this litigation.

### A.    Prelitigation Facts

Plaintiffs are three married couples: Latasha and Exabia Rouse, Daniel and Jessica Riley,

and Oscar and Sherryl Davines. (ECF No. 58 at 1, 3.) At separate times, each couple entered a

"purported contract for consumer goods" with one George LeMay. *See* (*id.* at 3 (citation omitted)).

LeMay later sued in various state courts to enforce these agreements, winning money judgments

on each. *See* (*id.* at 3–4). There was serious reason to doubt the judgments' validity. *See* (*id.*).

Nevertheless, between June 2020 and June 2021, LeMay registered all three judgments in the state

courts of Maryland, a State with which Plaintiffs had no prior connection. *See* (*id.* at 3–4).

After registering the foreign judgments, LeMay repeatedly petitioned the Maryland courts

for writs of garnishment against the three couples. (ECF No. 58 at 4.) Most of these petitions

succeeded. *See* (*id.* at 4–5). The initial garnishment proceedings were *ex parte*, with the couples

unaware of what was happening until after the first writs had issued. (*Id.* at 4–5.) LeMay did not

file, and the presiding courts did not require, affidavits addressing whether the couples included

any active-duty servicemembers. (*Id.* at 5.) Nor did the courts appoint counsel for the couples,

leaving them instead to obtain counsel at their own expense—again, only after they learned of the

proceedings. (*Id.*) As alleged, these acts violated the SCRA. *See* (*id.* at 8–10, 15, 20, 34).

Each couple faced significant collections activity as a result. Before July 19, 2021, when

the Garrett County district court vacated the foreign judgment against the Rouses, the couple was "subjected to at least 28 days of improper collection conduct," including the freezing of their accounts. (ECF No. 58 at 5 (citation omitted).)  For over a year until October 2021, when the Anne Arundel County district court dismissed LeMay's case against the Rileys, LeMay won four writs of garnishment and two subpoenas, causing certain of the Rileys' accounts to be frozen as well.  (*Id.*)  And before January 31, 2023, when that same court vacated the foreign judgment against the Davineses, LeMay won at least two of the five writs he sought.  (*Id.*)

### B.   Procedural History

Plaintiffs commenced this action on January 18, 2022.  (ECF No. 1.)  They named LeMay as the primary defendant, alleging violations of the SCRA and various state consumer protection laws.  (ECF No. 58 at 5–6.)  In January 2023, Plaintiffs settled with LeMay, *e.g.*, (ECF No. 37 at 1), shortly after which the Court dismissed LeMay from the case with prejudice, (ECF No. 41).

In their initial complaint, Plaintiffs also named, in his official capacity, then–Maryland Governor Lawrence Hogan.  *See* (ECF No. 1).  They alleged violations of the SCRA, the Supremacy Clause, and the Due Process Clause of the Fourteenth Amendment. *See* (*id.* at ¶¶ 181–202).  In late January 2023, pursuant to Federal Rule of Civil Procedure 25(d), Hogan was replaced by current Governor Wes Moore.  (ECF No. 58 at 6 n.4 (citing ECF No. 36).)

In March 2023, Plaintiffs filed an Amended Complaint. *See* (ECF No. 42).  They continued to name Moore as a defendant in his official capacity.  (*Id.*)  Additionally, they named the justices of the Supreme Court of Maryland, also in their official capacities: Chief Justice Matthew Fader and Justices Steven Gould, Brynja Booth, Shirley Watts, Michele Hotten, Jonathan Biran, and Angela Eaves (collectively, "Justices").  (*Id.*)  Against each of these governmental defendants, Plaintiffs reasserted their prior allegations regarding the SCRA, the Supremacy Clause, and the Due Process Clause. *See* (ECF No. 42 at ¶¶ 162–87); *see also* (ECF No. 58 at 6 & n.5).

In early April 2023, Defendants moved to dismiss the Amended Complaint. *See* (ECF No. 46). Plaintiffs then opposed Defendants' motion and sought partial summary judgment on certain questions of law. *See* (ECF No. 49 at 1, 17–18).

The Court addressed both motions in a Memorandum and Order dated March 20, 2024. *See* (ECF Nos. 58–59). The Court concluded Plaintiffs satisfactorily alleged their SCRA rights were violated when the Maryland courts issued writs of garnishment and subpoenas without following the procedures of 50 U.S.C. § 3931. *See* (ECF No. 58 at 20, 36–37). But the Court also dismissed Plaintiffs' claims to the extent they (1) were brought against Maryland Governor Wes Moore; (2) sought injunctive or declaratory relief; (3) sought to expunge state judicial records; (4) alleged violations of the Supremacy or Due Process Clauses by the state Uniform Enforcement of Foreign Judgments Act, Md. Code Ann., Cts. & Jud. Proc. §§ 11-801 to -807; or (5) were brought against the Justices based on decisions made in their legislative capacities as drafters of the Maryland Court Rules. *See* (ECF No. 58 at 36–37; ECF No. 59 at 1).

What remained was a single official-capacity claim against the Justices, brought under the SCRA, seeking actual damages based on the Justices' alleged violations of the same—but only to the extent those violations were caused by acts outside the Justices' legislative (and judicial) roles. *See* (ECF No. 58 at 31–37). The Court directed the parties to determine whether Plaintiffs' much-narrowed case would require additional discovery or invite further dispositive motions. *See* (*id.* at 37; ECF No. 59 at 1–2). Based on their responses, *see* (ECF No. 62), the Court set a handful of additional deadlines: one for Plaintiffs to seek leave to amend their complaint a second time, and three more for briefing on an expected dispositive motion by Defendants. *See* (ECF Nos. 63–64, 71). From these came the two motions before the Court today. *See* (ECF Nos. 72–73).

Notwithstanding Plaintiffs' pending request to amend a second time, *see* (ECF No. 72), the Amended Complaint remains the operative pleading. And apart from the substitution of Justice

4

Peter K. Killough for Justice Michele Hotten, *see* (ECF No. 76), the parties to this matter remain the same as when the Court addressed the last dispositive motions. *See* (ECF No. 58).

## II.    LEGAL STANDARDS

### A.    Motion for Summary Judgment

To earn summary judgment, the moving party must articulate a legally valid claim for relief and show "no genuine dispute as to any material fact" in support of that claim. *See* Fed. R. Civ. P. 56(a). The nonmoving party must then respond by "set[ting] forth specific facts showing that there [remains] a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003). At each stage, the Court views the facts and draws reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). If the Court determines that a reasonable jury could find in that party's favor, summary judgment will be denied. *See Anderson*, 477 U.S. at 248. But the nonmoving party cannot rest on mere denials. It must set out its own specific facts showing a genuine dispute. *Bouchat*, 346 F.3d at 525 (citation omitted). This requires more than a "scintilla of evidence." *Anderson*, 477 U.S. at 252.

### B.    Motion for Leave to Amend

At this juncture, Plaintiffs "may amend [their] pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2).[1] Even where, as here, the opposing party does not consent, *see generally* (ECF No. 73 at 23–27), the Court must still "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). This is a relatively generous standard:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper

---

[1] The Federal Rules also permit a party to amend its pleading "once as a matter of course" within twenty-one days of serving that pleading, Fed. R. Civ. P. 15(a)(1), or, if a responsive pleading is required, within twenty-days of service of (1) the responsive pleading or (2) a responsive motion made under Rule 12(b), (e), or (f), whichever is earlier, Fed. R. Civ. P. 15(a)(2). Because these deadlines have long elapsed, *see* (ECF No. 12 at 19 (Defendants' Answer, served on March 14, 2022); ECF No. 46 (Defendants' pre-answer Motion to Dismiss Plaintiffs' Amended Complaint, served via CM/ECF on April 7, 2023)), Plaintiffs' Motion for Leave to Amend is governed instead by Rule 15(a)(2), which addresses "all other cases" in which a party seeks to amend its pleadings.

subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962). In applying this standard, however, the Court retains broad discretion, "so long as it does not outright refuse 'to grant the leave without any justifying reason.'" *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010) (quoting *Foman*, 371 U.S. at 182).[2]

## III.    ANALYSIS

For the reasons below, Defendants' Motion for Summary Judgment will be granted, and Plaintiffs' Motion for Leave to Amend will be denied.

### A.    Defendant's Motion for Summary Judgment

Defendants' argument for summary judgment is straightforward. The Court previously declined to dismiss Plaintiffs' SCRA claim against the Justices, but only to the extent the claim rested on the Justices' nonjudicial, nonlegislative acts, if any. *See* (ECF No. 58 at 33–37). In Defendants' view, Plaintiffs do not—and cannot—identify any relevant nonjudicial, nonlegislative acts. *See* (ECF No. 73-1 at 19–20). As a result, whatever acts Plaintiffs *do* identify are inadequate to overcome the Justices' various individual immunities.[3] *See* (*id.*)

Although the question is a close one, touching on sensitive issues of public power and accountability, the Court is persuaded by this argument. Defendants' Motion for Summary

_____

[2] The Court often imposes an additional good-cause requirement for leave to file non–matter-of-course amendments, at least when leave is sought after the relevant Court-mandated deadline. Here, however, Plaintiffs sought leave prior to the Court's deadline of June 24, 2024. *See* (ECF Nos. 71–72). Accordingly, no showing of good cause is required.

[3] These immunities, which include absolute legislative and judicial immunities, are also called "personal immunities," *e.g.*, *Lewis v. Clarke*, 581 U.S. 155, 163 (2017), and "official immunities," given their connection to their holders' duties as government officers, *e.g.*, *Forrester v. White*, 484 U.S. 219, 223–24 (1988). For purposes of this decision, the Court refers to them only as "individual immunities."

Judgment will be granted.

         1.      <u>The Court Previously Declined to Dismiss Plaintiff's SCRA Claim Against
the Justices, But Only to the Extent Plaintiffs Pled Injuries Caused by the
Justices Acting in a Relevant Nonlegislative, Nonjudicial Capacity.</u>

This is not the first time the Court has addressed the propriety of anchoring a claim to the

Justices' official conduct. Upon consideration of the parties' earlier dispositive motions, the Court

characterized Plaintiffs' case against the Justices this way:

> Plaintiffs contend that the Justices are liable as members of the government entity
> responsible for "appoint[ing] members of the Rules Committee,"
> "recommend[ing] . . . changes to the Maryland Rules," and "adopt[ing]
> amendments . . . and new rules of civil procedure that apply to every state court
> within Maryland." [(ECF No. 42 at ¶ 28 (citation omitted).)] The Justices are
> allegedly responsible for "the enforcement and application of the statutes and
> Maryland Rules at issue in this matter." (*Id.* at ¶ 169.) Plaintiffs allege that Chief
> Justice Fader has "overall responsibility for the administration of the courts of the
> State," and argue that this makes him a proper Defendant. (*Id.* at ¶ 28 [(citation
> omitted)].)

(ECF No. 58 at 7 (citations altered for clarity).) Based on those contentions, in conjunction with

the facts Plaintiffs alleged at the time, the Court observed that Plaintiffs sued the Justices primarily

"for their role in promulgating and enforcing the Maryland Rules"—not for their role in deciding

cases, nor for any other activity. *See* (*id.* at 31–32).

The Court subsequently dismissed that element of Plaintiffs' claim. Because the Justices

"'exercis[ed] the State's entire legislative power' in promulgating the Maryland Rules," they were

entitled to invoke legislative immunity with respect to any decisions involving the adoption or

non-adoption of the same. *See* (ECF No. 58 at 33–34 (citation omitted)). To the extent Plaintiffs'

claim sought relief from acts within that "sphere of legitimate legislative activity," (*id.* at 34

(citation omitted)), that part of their claim was barred. *See* (ECF No. 59 at 1).

But another part of Plaintiffs' claim remained. As the Court put it at the time,

> Plaintiffs[] have not sued the Justices merely based on the *promulgation* of the
> Maryland Rules. The Plaintiffs also object to actions taken pursuant to those Rules,
> actions this Court has already determined violate the SCRA. Plaintiffs argue that

the Justices have "some connection to enforcement" and note that the Chief Justice is the "administrative head of the judicial system of the state." (ECF No. 49 at 30, 44 [(citation omitted)].)

(ECF No. 58 at 34 (emphasis in original) (citation altered for clarity).)  The Court acknowledged at least some reason to believe "the power of the Maryland courts goes beyond legislative or adjudicative power." (*Id.* at 35.)  And it observed that, to the extent the Justices exercised any such power, they would be acting in an enforcement capacity, unprotected by legislative or judicial immunities. (*Id.*)

Based on the record at the time, however, the Court was unable to conclude whether the Justices in fact had an enforcement role, let alone one relevant to the alleged SCRA violations. *See* (ECF No. 58 at 36 (observing that Plaintiffs' thin assertions, along with the parties' briefing directed mainly to other topics, left the Court "with more questions than answers")).  The result was that Plaintiffs' SCRA claim survived—if just barely. (*Id.* ("Plaintiffs have stated a claim upon which relief *may* be granted, no more." (emphasis in original)).)  Defendants' pending Motion for Summary Judgment addresses the residue of that claim. *See generally* (ECF No. 73-1).

2.  On the Remainder of Plaintiffs' SCRA Claim Against the Justices, Defendants Have Met Their Burden for Summary Judgment.

Defendants' argument for summary judgment proceeds in three steps.  First, Defendants state that, far from identifying an enforcement capacity, Plaintiffs "identif[y] no specific action, other than promulgating rules, that the Justices should (or even could) have taken to safeguard [Plaintiffs'] rights under the SCRA." (ECF No. 73-1 at 19); *see generally* (*id.* at 18–21; ECF No. 75 at 3–4).  Second, they reiterate that Plaintiffs' sole theory of causation—the Justices' alleged failure to promulgate more protective rules—is foreclosed by legislative immunity. (ECF No. 73-1 at 19–20); *see generally* (*id.* at 16–24; ECF No. 75 at 2–7).  Third, they rely implicitly on the proposition that the Justices' individual immunities inure to the benefit of the State in an official-capacity suit. *See* (ECF No. 73-1 at 16–18).

8

On Plaintiffs' remaining claim, Defendants have met their burden for summary judgment. They have shown they are entitled to judgment as a matter of law, and that there exists no genuine issue of material fact that might otherwise preserve Plaintiffs' case. The Court addresses each element of Defendants' argument below.

       i.      *Defendants Have Shown the Justices' Responsibilities Are Highly Limited, and that, in Any Event, Only One of Those Responsibilities Bears Any Relationship to Plaintiffs' SCRA Claim.*

As Defendants explain, the Justices' duties are broad but few. Their "principal role" is to decide cases on appeal from the lower courts of the State. (ECF No. 73-1 at 11); *see generally* Md. Const. art. IV, §§ 1, 14; Md. Code Ann., Cts. & Jud. Proc. §§ 12-101 to -702; Md. Rules 8-101 to -611. They are also required to develop rules governing the procedure in and administration of all the State's courts. *See* Md. Const. art. IV, § 18(a); *see generally* Md. Code Ann., Cts. & Jud. Proc. § 1-201. And they "may appoint such officers . . . as may be found necessary" for the operation of their *own* court. *See id.* § 9. While various statutes clarify the scope and operation of these responsibilities, *see* (ECF No. 73-1 at 11–12), in general, the Justices' authority ends there.

As "the administrative head of the Maryland judicial system," the chief justice holds duties beyond those of the other Justices. *See* (ECF No. 73-1 at 12); *see generally* Md. Const. art. IV, § 18(b)(1)–(5); Md. Rule 16-102. Many of these additional duties involve personnel—namely, "appointing, designating, assigning, and approving the appointment of" people to various judicial posts, including judgeships. (ECF No. 73-1 at 12 (citing Md. Const. art. IV, §§ 3A, 18(b)(2); Md. Code Ann., Cts. & Jud. Proc. §§ 1-302, -607, 3-806 to -807, 13-101(a)–(b); Md. Rules 16-102(b), -104(a), -105(a), -108(b)).) The chief justice also sets the rates of pay for employees in the circuit courts clerks' offices, Md. Code Ann., Cts. & Jud. Proc. § 2-505, and reviews "personnel policies and procedures applicable to employees" throughout Maryland's judiciary, Md. Rule 16-806. Defendants likewise note his role in providing "direction to certain people in the execution of their

administrative duties," (ECF No. 73-1 at 12)—an oblique reference to his broad authority over the administration of the State's courts. *See, e.g.*, Md. Rules 16-103, -111. Other miscellaneous duties include chairing the state Judicial Council, Md. Rule 16-110, approving circuit courts' case management plans, Md. Rule 16-302, overseeing the preparation of continuity-of-operations plans, Md. Rule 16-803, and "receiv[ing] and review[ing] reports regarding the work and business of the Maryland judiciary," (ECF No. 73-1 at 13 (citing Md. Const. art. IV, § 18(b)(1); Md. Code Ann., Cts. & Jud. Proc. § 2-504.1; Md. Rules 16-302, 18-602)).

Of all these collective responsibilities, just one bears a plausible relationship to Plaintiffs' SCRA claim. Plaintiffs' alleged injuries arise out of judicial proceedings, not court administration, which means responsibilities with no connection to proceedings—like courthouse administrative duties—cannot support Plaintiffs' theory. *See* (ECF No. 42 at ¶ 7). On top of that, Plaintiffs assert the Justices failed to *prevent* harm, not that they failed to rectify it after the fact, (*id.* at ¶ 169), as evinced by statements like "[t]he State of Maryland has the burden [of] protect[ing] non-residents . . . *before* making them subject to court proceedings in the state," (*id.* at ¶ 44 (emphasis added)), "Maryland law does not require a party *seeking* to obtain a [writ of garnishment] . . . to provide any evidence that the judgment debtor/defendant is not an active-duty servicemember," (*id.* at ¶ 46 (emphasis added)), and "the State of Maryland's laws and procedures *permitted* the conduct against the Plaintiffs complained of in this action," (*id.* at ¶ 51 (emphasis added)). Only the Justices' rules-related responsibilities, such as they are, connect with actual proceedings *and* support Plaintiffs' forward-looking theory of liability. And indeed, this is the only responsibility Plaintiffs marshal in support of their case. *See, e.g.*, (*id.* at ¶¶ 4, 7, 11, 29).

On this score, the Court ultimately agrees with Defendants: aside from *promulgating* rules, it is unclear what rules-related actions the Justices themselves "should (or even could) have taken to safeguard [Plaintiffs'] rights." *See* (ECF No. 73-1 at 19–20). The authorities that delineate the

10

Justices' collective responsibilities offer no indication of an "enforcement capacity" with respect to the rules—only a capacity to create, amend, or withdraw those rules, or to regulate the process by which such actions are taken. *See* Md. Const. art. IV, § 18(a); Md. Code Ann., Cts. & Jud. Proc. §§ 13-301 to -303; Md. Rule 16-701. So, for whatever enforcement duties the Justices may hold in their portfolios, *see* (ECF No. 58 at 34–36), Defendants have shown there exists no such duty where Plaintiffs' theory of harm is concerned.

> ii.     *Defendants Have Shown that, as a Matter of Law, Suits Concerning the Justices' Rules-Related Responsibilities are Barred by Legislative Immunity.*

Having been persuaded by Defendants' argument that the Justices lack an enforcement capacity concerning the Maryland Court Rules, the Court considers the availability of individual immunities with respect to the rules responsibilities the Justices *do* have. Again, these include only a capacity to create, amend, or withdraw the rules, or to regulate the process by which those actions are taken. *See* Md. Const. art. IV, § 18(a); Md. Code Ann., Cts. & Jud. Proc. §§ 13-301 to -303; Md. Rule 16-701.

As the Court made clear in its prior decision, *see* (ECF No. 58 at 33), legislative immunity "attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)). That means it shields all "integral steps in the legislative process," even if taken by non-legislators, and even if taken under authorities legislators could never hold. *See id.* (noting that legislative immunity shields, among other things, the executive veto function). This roomy standard reaches everything the Justices may (or may not) do with respect to formulating the content of the rules.[4]

---

[4] It is of no moment that the rules are promulgated not by the Justices alone, but with the assistance of their appointees on the Rules Committee, a standing body of legal professionals authorized to "aid in the exercise of [the Justices'] rulemaking powers." Md. Code Ann., Cts. & Jud. Proc. § 13-301. It is well settled that legislative immunity "covers all those properly acting in a legislative capacity, not just actual officeholders." *EEOC v. Wash. Suburb. Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011) (citing *Consumers Union*, 446 U.S. at 731–34).

In support of this point, Defendants cite persuasively to the Supreme Court's decision in *Supreme Court of Virginia v. Consumers Union of the United States*, 446 U.S. 719 (1980). *See* (ECF No. 73-1 at 16–17). In that case, plaintiffs brought an action for injunctive and declaratory relief against, among others, the state supreme court and its chief justice, in both his individual and official capacities. *Consumers Union*, 446 U.S. at 721, 725–26. In short, plaintiffs feared their attempts to create a legal services directory would run afoul of a provision of the state bar code that prohibited attorney advertising. *See id.* at 724–25. They also believed that provision violated their First and Fourteenth Amendment rights. *Id.* at 726. So, they sued in federal court to enjoin against its future enforcement. *Id.* The district court, sitting as a panel of three judges, granted relief. *See id.* at 727–28.

On direct appeal, the Supreme Court largely affirmed. To start, it made clear that, to the extent plaintiffs' suit was founded on "the issuance of, or failure to amend, the challenged rules," it was barred by legislative immunity. *Consumers Union*, 446 U.S. at 734. But it also observed that the state supreme court "performs more than a legislative role with respect to the State Bar Code." *Id.* Specifically, it "hears appeals from lower court decisions in disciplinary cases, a traditional adjudicative task; and in addition, it has independent enforcement authority of its own." *Id.* This "independent enforcement authority" consisted of an "inherent power to discipline attorneys" as well as a statutory power to initiate disciplinary proceedings against members of the state bar. *Id.* at 724 ("[The statute] provides that if the [supreme court] or any other court of record observes any act of unprofessional conduct, *it may itself*, without any complaint being filed by the State Bar or by any third party, issue a rule to show cause against the offending attorney." (emphasis added)). The existence of this independent, quasi-prosecutorial power led the Supreme Court to conclude "that the [state supreme court] and its chief justice properly were held liable in their enforcement capacities." *Id.* at 736; *see also* (ECF No. 58 at 34).

12

There is no indication the Justices hold an analogous enforcement role with respect to the Maryland Court Rules. *See supra* Section III.A.2.i; *see generally* Md. Rules 18-401 to -442 (setting out Maryland's judicial disciplinary procedures, which seem to give the Justices only an adjudicative role, *see* Md. Rule 18-437, not a quasi-prosecutorial one). But even if there were such an enforcement function, the nub of Plaintiffs' claim is that there is no rule to be enforced. *See, e.g.*, (ECF No. 42 at ¶¶ 44, 46, 51, 169). Insofar as Plaintiffs' claim centers on the absence of a prophylactic rule, *Consumers Union* forecloses relief. This is because the Justices "exercis[e] the State's entire legislative power with respect to regulating" Maryland's judicial procedure, making them "the State's legislators for the purpose of issuing" the Maryland Court Rules. *See Consumers Union*, 446 U.S. at 734; Md. Const. art. IV § 18(a). And acts taken in that capacity are wholly immune from suit. *See Consumers Union*, 446 U.S. at 734; *see also* (ECF No. 58 at 33–34, 36). Because Defendants have shown Plaintiffs' theory to involve acts taken *only* in that capacity, individual immunity attaches to all acts relevant to Plaintiffs' claim.

> iii.    *As a Matter of Law, Individual Immunity from Suit over the Justices'*
> *Rules-Related Responsibilities Inures to the Benefit of the State.*

The Court must now decide whether the State can avail itself of the Justices' individual immunities. This is because Plaintiffs' lone remaining claim is brought against the Justices in their official capacities. *See* (ECF No. 42 at ¶ 29; ECF No. 59 at 1). And official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (citation omitted). As a result, "a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to *the government entity itself*" for payment, *id.* at 166 (emphasis added), making the State of Maryland the real party in interest in this case.[5]

---

[5] Personal-capacity suits, by contrast, "seek to impose personal liability upon a government official for actions he takes under color of state law." *Graham*, 473 U.S. at 165. Any damages award "can be executed only against the

13

It may feel obvious that legislative acts are not a proper subject of suit. After all, individual immunities attach based on "the nature of the function performed, not the identity of the actor who performed it." *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997) (citation omitted). And because they attach to those who perform certain functions, *when* they perform those functions, *see id.*, it is natural to think that what immunities shield are the functions themselves, not merely those who discharge them. *Cf., e.g.*, *Malley v. Briggs*, 475 U.S. 335, 342 (1986) (recognizing an absolute immunity "not from an exaggerated esteem for those who perform th[at] function[], and certainly not from a desire to shield abuses of offices, but because any lesser degree of immunity could impair the . . . process itself" (citation omitted)). On that view, a State could not be made to answer for its officials' protected acts, separate and apart from those officials' freedom from personal liability. Policy considerations favor such a result. *See, e.g.*, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975) ("Private civil actions . . . may be used to delay and disrupt the legislative function."); *Bogan*, 523 U.S. at 54–55 ("[I]t simply is 'not consonant with our scheme of government for a court to inquire into the motives of legislators.'" (quoting *Tenney*, 341 U.S. at 377)). And neither party offers serious reason to doubt it.[6]

But the question is more difficult than it first appears. On top of the peculiar confluence of features that sharply limits the availability of controlling precedent in this case,[7] other courts have discussed the applicability of individual immunities in ostensibly conflicting ways, leaving this Court to reconcile seemingly inconsistent statements of law.

To start, the Supreme Court observed in *Kentucky v. Graham* that because an official-

---

official's personal assets." *Id.* at 165–66.

[6] Plaintiffs offer only the cursory assertion that "[t]he legal defenses raised by the State simply do not apply to the State generally." (ECF No. 74 at 29.)

[7] These features include the suit being one for damages, (ECF No. 42 at 1), brought against functionally legislative officials in their official capacities, *supra* Section III.A.2.ii, in a context in which the State lacks sovereign immunity, (ECF No. 58 at 26–31).

capacity damages suit "is *not* a suit against the official personally," official-capacity defendants may not invoke individual immunities. 473 U.S. at 166–67 (dictum) (emphasis in original); *accord Lewis v. Clarke*, 581 U.S. 155, 162–63 (2017). This includes both the absolute immunities associated with certain public roles, like that of a prosecutor in their capacity as advocate, as well as the qualified immunity that shields other government officials. *See Graham*, 473 U.S. at 166–67 (collecting cases). Accordingly, "[t]he only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess." *Id.* at 167 (dictum); *accord Lewis*, 581 U.S. at 163; *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *see also Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 677 n.* (1996). Although *Graham* concerned a suit against an executive official, 473 U.S. at 161–62, and primarily relied upon cases involving the same, *see id.* at 166–67, it made no attempt to cabin its rule to that context. Following the principle here would wholly undercut Defendants' assertions of individual immunities, *see* (ECF No. 73-1 at 16–21, 24; ECF No. 75 at 5–12), as well as this Court's prior rulings on that subject, *see* (ECF No. 58 at 31–36).

But at least one decision appears to have reached the opposite result. As explained above, *Consumers Union* affirmed the lower court's conclusion that "the [state supreme court] and its chief justice properly were held liable in their enforcement capacities." 446 U.S. at 736. Yet the Supreme Court took umbrage with a separate part of the lower court's reasoning—namely, its choice to award attorneys' fees based on the state court's "continued failure and apparent refusal to amend [the bar code] to conform with constitutional requirements." *Id.* at 728–29 (citation omitted). Even though the fees were to be paid from public treasury funds, not by the defendants themselves, the Supreme Court vacated the award for being "premised on acts or omissions for which [the defendants] enjoyed absolute legislative immunity." 446 U.S. at 738–39. The court also noted that, although Congress could have abrogated the immunity, there was no indication it

15

intended to do so in the fee statute. *Id.* at 738. In the end, the court determined it would "run[]

counter" to the defendants' individual immunities "for a district court's [award] to be guided by

considerations centering on the exercise or nonexercise of the state court's legislative powers." *Id.*

at 739.

Under the yoke of these conflicting lines of authority,[8] lower courts have not always ruled

consistently. Every geographic circuit has either stated or employed the principle that individual

immunities are unavailable in official-capacity suits.[9] Yet at least one has circuit has expressly

stated the opposite, *see Scott v. Taylor*, 405 F.3d 1251, 1256–57 (11th Cir. 2005) (dictum), as have

multiple judges of this Court, *see, e.g.*, *Lemon v. Hong*, Civ. No. ELH-16-0979, 2016 WL

3087451, at \*4 (D. Md. June 2, 2016), *aff'd*, 671 F. App'x 79, 79–80 (4th Cir. 2016) (per curiam);

*Westfall v. Tichnell*, Civ. No. GJH-20-0271, 2021 WL 2434432, at \*3 (D. Md. June 15, 2021);

*Racine v. Cecil County*, 843 F. Supp. 53, 55 (D. Md. 1994). And while some of this discrepancy

may be the result of judges and litigants who "discuss immunity defenses without clearly

articulating to whom and in which capacity those defenses apply," *Turner v. Houma Mun. Fire &*

---

[8] Although the law of individual immunities has developed mainly in the context of 42 U.S.C. § 1983 actions against local governments and state and local officials, the Court sees no reason to question the applicability of those principles here. The Supreme Court has repeatedly acknowledged immunity doctrine's common-law roots and trans-substantive applicability. *See, e.g.*, *Tenney*, 341 U.S. at 372–76; *Bradley v. Fisher*, 80 U.S. 335, 347 (1871); *Clinton v. Jones*, 520 U.S. 681, 692–93 & n.18 (1997); *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976) (stating that § 1983 "is to be read in harmony with general principles of tort immunities and defenses"). And it appears always to have spoken of immunity in general terms, disconnected from any specific rights or rights of action. *See, e.g.*, *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982) (referring to immunity from "damages liability"); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("liability for civil damages"); *Bradley*, 80 U.S. at 357 ("liab[ility] to answer in damages"); *Jones*, 520 U.S. at 692 ("suits for money damages"); *Imbler*, 424 U.S. at 431 ("civil suit[s] for damages"); *Butz v. Economou*, 438 U.S. 478, 514 (1978) ("damages liability"); *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 405 (1979) ("recovery of damages").

[9] *See, e.g.*, *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 705 (1st Cir. 1993); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993); *Lonzetta Trucking & Excavating Co. v. Schan*, 144 F. App'x 206, 211 & n.3 (3d Cir. 2005) (unpublished decision); *Hughes v. Blankenship*, 672 F.2d 403, 405–06 (4th Cir. 1982); *Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.*, 229 F.3d 478, 482–86 (5th Cir. 2000); *Top Flight Ent., Ltd. v. Schuette*, 729 F.3d 623, 633–34 (6th Cir. 2013); *Capra v. Cook Cnty. Bd. of Rev.*, 733 F.3d 705, 711–12 & n.4 (7th Cir. 2013); *VanHorn v. Oelschlager*, 502 F.3d 775, 778–79 (8th Cir. 2007); *Schmidt v. Contra Costa County*, 693 F.3d 1122, 1131 n.10 (9th Cir. 2012); *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1156 (10th Cir. 2011); *Kimberly Regenesis, LLC v. Lee County*, 64 F.4th 1253, 1259–60 (11th Cir. 2023); *Daskalea v. District of Columbia*, 227 F.3d 433, 449 (D.C. Cir. 2000).

*Police Civ. Serv. Bd.*, 229 F.3d 478, 485 & n.12 (5th Cir. 2000), at least a few courts have acknowledged, and have even sought to reconcile, the tension between *Graham* and *Consumers Union. See, e.g., Cushing v. Packard*, 30 F.4th 27, 39–40 (1st Cir. 2022) (holding no conflict because *Graham* concerned damages while *Consumers Union* concerned prospective relief); *Scott*, 405 F.3d at 1254–55 & n.6 (same); *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 84–88 & n.9 (2d Cir. 2007) (same).

Given the substantial uncertainty around this weighty issue, the Court declines to break new ground. Again, as relevant to Plaintiffs' SCRA theory, the Court has determined the Justices' relevant responsibilities consist only of promulgating rules of procedure—acts of an undeniably legislative character. *See supra* Section III.A.2.i. To bar the invocation of individual immunities, then, would be to subject the State to suit over conduct for which its officers would be individually immune. *See supra* Section III.A.2.ii. The Court is unaware of a prior instance in which a private party was permitted to recover damages from a State over even an affirmatively harmful law or judgment, much less an insufficiently protective one. Nor have Plaintiffs provided examples of any. Indeed, this was the line *Consumers Union* apparently refused to cross, albeit with respect to fees, not damages. *See id.* at 738–39. And the Supreme Court has given no affirmative indication it intends to depart from this principle, *Graham* having even cited approvingly to that part of *Consumers Union* without acknowledging the tension between them. *See* 473 U.S. at 164 & n.8.

To be sure, there is a colorable argument that individual immunities ought not to apply. As noted, Plaintiffs' remaining claim is for damages only. *See* (ECF No. 42 at 55–56; ECF No. 59 at 1). And several decisions that reconcile *Graham* with *Consumers Union* do so on the basis of the remedy sought, observing that *Consumers Union* dealt solely with the question of immunity from *prospective* relief. *See Cushing*, 30 F.4th at 39–40; *Scott*, 405 F.3d at 1254–55 & n.6; *State Emps.*,

494 F.3d at 88.[10]  *But see Scott*, 405 F.3d at 1257 (noting, in dicta, that immunity would apply "regardless of whether a suit seeks damages or prospective relief and regardless of whether the [defendants] are named in their individual or official capacity").  Under that reading of *Consumers Union*, individual immunities would be wholly irrelevant to Plaintiffs' damages claim.

But the Court remains unconvinced.  While damages awards based on executive acts are "run-of-the-mill occurrences," it would be a difference in kind, not degree, to award damages based on legislative and judicial acts.  *See Consumers Union*, 446 U.S. at 739.  And Congress "does not hide elephants in mouseholes."  *See Whitman v. Amer. Trucking Assocs.*, 531 U.S. 457, 468 (2001) (cleaned up).  Although *Consumers Union* did not deal squarely with the question of damages (as opposed to fees), it does make clear that, as a default proposition, public money may not be awarded based on acts for which public officials are absolutely immune in their individual capacities.  446 U.S. at 739.  Here, as in that case, there is simply "no indication that Congress intended to permit an award of [damages] to be premised on acts that themselves would be insulated from even prospective relief."  *See id.*; *see also Graham*, 473 U.S. at 164 & n.8.  Absent unmistakable direction from Congress or a higher court, this Court is unwilling to take such an unprecedented step in the other direction.[11]

---

[10] Both *Scott* and *State Employees* expressly attributed their conclusions to the fiction of *Ex parte Young*, 209 U.S. 123 (1908), which holds that official-capacity suits for *prospective* relief against state officials are *not* considered suits against the State, contrary to the general rule.  *See Scott*, 405 F.3d at 1255; *State Emps.*, 494 F.3d at 87, 95; *see also Cushing*, 30 F.4th at 40 n.13.  As *State Employees* put it, "the individual defense of legislative immunity *was* available for the same reason that the official defense of [sovereign] immunity *was not* available—namely, because the suit in question was not considered to be a suit against the state itself."  494 F.3d at 87 (emphasis in original) (citing *Scott*, 405 F.3d at 1255).

[11] The Court emphasizes the distinction between this result and the Court's earlier decision on sovereign immunity.  As previously explained, when it comes to Congress's constitutional power to raise and support a military, the States gave up whatever sovereign immunity they had at the time of the founding.  (ECF No. 58 at 28 (citing *Torres v. Tex. Dep't of Pub. Safety*, 597 U.S. 580, 589–90 (2022)).)  And because the SCRA is a valid exercise of that constitutional power, Plaintiffs' suit is not barred by sovereign immunity.  (*Id.*)

  This dissolution of one barrier to suit is a feature of our constitutional design, not a bug—and Maryland's invocation of Defendants' individual immunities is not to the contrary.  Rather, it accords with traditional and prudential limits on what *kinds* of governmental action can give rise to damages liability.  *See, e.g.*, *Consumers Union*, 446 U.S. at 731–35, 739; *Scott*, 405 F.3d at 1256.  Plaintiffs are therefore incorrect to suggest that applying individual immunities would create an "exception" to the SCRA's remedial mandate.  *See, e.g.*, (ECF No. 74 at 20–23).  Quite

      3.     Plaintiffs Fail to Identify Any Defects in Defendants' Legal Theories or Show a Genuine Dispute of Material Fact Underlying the Same.

Plaintiffs offer various legal arguments to rebut Defendants' *prima facie* case, some of which are unnecessary,[12] and none of which are availing. For instance, they argue repeatedly that recognizing an individual immunity would create an "exception" to the SCRA. *E.g.*, (ECF No. 74 at 20–23). But individual immunities are well-settled principles of background law, regularly held to harmonize with Congress's positive enactments. *See, e.g.*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66–67 (1989). As such, they can hardly be considered "exceptions," much less something Congress is affirmatively required to write *into* a statute, as Plaintiffs would prefer. *See* (ECF No. 74 at 24, 29, 37 n.15). Nor can the Court agree that recognizing an individual immunity would undercut its earlier determination that sovereign immunity does not apply. *See* (ECF No. 74 at 24–27). As explained above, the two immunities serve distinct purposes; they do not always travel together. *See supra* n.10. And so, insofar as Plaintiffs argue the absence of sovereign immunity here somehow distinguishes *Consumers Union*, *see* (ECF No. 74 at 30 (describing reliance on that case as "misplaced")), the Court cannot agree.

Plaintiffs appear to dismiss the focus on the Justices as mere hand-wringing over the case caption, given that an official-capacity suit is ultimately one against the State. *See* (ECF No. 74 at 29 (describing the choice to name the Justices as "likely . . . not necessary" and "simply a reflection

---

apart from any changes in the landscape of state sovereign immunity, the SCRA contains no indication of Congress's intent to alter the landscape of individual immunities. And were the Court to rule otherwise, it would simply confront a separate, similarly thorny question: whether Congress spoke clearly enough in the SCRA to subject States to liability for their judicial and/or legislative acts. *See Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991) (requiring Congress to legislate clearly whenever a statute "would upset the usual constitutional balance of federal and state powers"); *see also Tenney*, 341 U.S. at 376 (describing as a "big assumption" the idea "that Congress has constitutional power to limit the freedom of State legislators acting within their traditional sphere," and an "ever rasher assumption to find that Congress thought it had exercised that power"). For today's purposes, the Court need not decide that issue.

[12] Plaintiffs spend much of their opposition brief arguing, in essence, that the SCRA applies to the State and its courts, *see* (ECF No. 74 at 20–23)—something this Court has already held, (ECF No. 58 at 10, 15, 20), Defendants readily concede, (ECF No. 73-1 at 20–22; ECF No. 75 at 4, 6), and which is clear from the plain text of the SCRA in any event, *see* 50 U.S.C. §§ 3911(5), 3912(b).

of general custom and practice of similar claims against the State and demands of the assistant attorneys general assigned to the case")). But to the extent this suggests the acts of individual state officials are irrelevant to the litigation, the Court disagrees, for at least two reasons. First, while Plaintiffs are correct that their suit is effectively against the State, *see Graham*, 473 U.S. at 165, the caption in an official-capacity action nevertheless says something about the substance of a plaintiff's theory. *Cf., e.g.*, *Chase v. City of Portsmouth*, 428 F. Supp. 2d 487, 490 (E.D. Va. 2006). In this case, both the caption and the body of the pleadings make clear that Plaintiffs' theory centers on the Justices. *See, e.g.*, (ECF No. 42 at ¶ 169). Second, that a suit is against a State—whether in name or in effect—does not mean a court must, or even may, disregard the role of state officials in the alleged injuries. The fact of a damages suit being against a State is merely an indicator of the source of any potential award. *See Graham*, 473 U.S. at 166. It does not relieve a plaintiff of their duty to articulate a coherent theory of harm. And because a State is an abstract entity, incapable of causing harm itself, any plaintiff seeking to recover from the state treasury must root their theory in acts performed by state employees. *See* (ECF No. 75 at 11). To hold otherwise would be to elide the basic requirement of causation. Accordingly, the proposition that the SCRA does not require "a claim . . . [to] be asserted against a <u>person</u>[,] as is required by a § 1983 claim," (ECF No. 74 at 29 (emphasis in original)), is accurate only as a matter of captioning formality.

Plaintiffs also argue Maryland law "waives" Defendants' individual immunities. *See, e.g.*, (ECF No. 74 at 35 ("The State's own Constitutional protections guarantee 'that every man, for any injury done to him in his person or property, ought to have a remedy by the course of the Law of the Land, according to the Law of the Land.'" (cleaned up) (quoting Md. Const., Decl. Rts., art. 19))). But as Defendants observe, *see* (ECF No. 75 at 6–7), any remedy guaranteed by the Maryland Constitution is awarded only "according to the Law of the Land." Md. Const., Decl. Rts., art. 19. And the "Law of the Land," as used in that article, "is the same due process of law

required by the Fourteenth Amendment." *Franklin v. Mazda Motor Corp.*, 704 F. Supp. 1325, 1337 (D. Md. 1989) (quoting *Attorney General v. Johnson*, 385 A.2d 57, 71 (Md. 1978)).  Given the federal courts' longstanding practice of applying individual immunities in cases asserting violations of the Fourteenth Amendment, *see, e.g.*, *Consumers Union*, 446 U.S. at 726, 738; *Stump v. Sparkman*, 435 U.S. 349, 353 n.2, 364 (1978), any suggestion that such immunities violate the same is without merit.[13]

On top of all that, Plaintiffs fail to identify a triable issue.  In particular, even when viewing the facts in the light most favorable to them, Plaintiffs adduce nothing to show that the Justices have an enforcement function with respect to the Maryland Court Rules.  This is fatal, as the shaky prospect of an enforcement role was the sole leg on which the case remained standing following the Court's decision on Defendants' earlier motion to dismiss.  *See* (ECF No. 58 at 36–37).

In lieu of specific arguments or facts to rebut Defendants' *prima facie* case, Plaintiffs offer a series of broad, conclusory statements that merely gesture at the possibility of some activity for which the State would not be immune.  For example, Plaintiffs claim to sue "not solely . . . for [Defendants'] failure to enact rules or legislation," but also for their "failure to enforce the remedial protections established by Congress" through the SCRA.  (ECF No. 74 at 33.)  Even if the Court were to overlook the conclusory nature of the phrase "failure to enforce," this statement appears to suggest Plaintiffs are suing over lower court's missteps *during* the collections proceedings— something undoubtedly shielded by judicial immunity.  *See, e.g.*, *Stump*, 435 U.S. at 356–57.  Plaintiffs then recapitulate several of the chief justice's administrative duties.  *See* (ECF No. 74 at

---

[13] Plaintiffs mount a similar waiver argument with respect to the Justices' oaths of office.  *See* (ECF No. 74 at 36 ("[T]he public officials advancing the argument that the State of Maryland is immune or excused [for] violating its mandatory SCRA duties simply appear to have forgotten their oaths of office[,] which require them to protect and enforce all laws[,] including the SCRA . . . ." (citation omitted)).  But insofar as the oaths create binding legal obligations—itself a doubtful proposition, *see, e.g.*, *Neithardt v. Garvey*, Civ. No. LKG-22-0815, 2023 WL 5671606, at *9 (D. Md. Sept. 1, 2023); *Johnson v. Thomas*, Civ. No. WEB-10-0151, 2011 WL 1344008, at *4 (E.D.N.C. Apr. 8, 2011)—their terms do no more than reaffirm the Justices' obligations within the preexisting legal landscape, which embraces both the duties of the SCRA and the protections of common-law immunity.  *See* (ECF No. 75 at 7).

33–34). But beyond involving some version of the word "administrative," these do nothing to support Plaintiffs' theory, which, again, demands a duty that has a nexus with actual proceedings. *See supra* Section III.A.2.i. Finally, Plaintiffs assert there is "no question" the Justices "are responsible for ensuring that every state court judge and official of the Maryland judiciary complies with the mandatory requirements of the SCRA." (ECF No. 74 at 34.) But that is hardly clear. After all, Maryland's district judges are vested with "[t]he Judicial power of th[at] State" to the same extent as the Justices themselves. Md. Const. art. IV, § 1. And each is equally bound to follow the dictates of federal and state law, including the Maryland Court Rules. *See* U.S. Const. art. VI, cl. 2; Md. Const. art. IV, §§ 1, 18(a). Beyond the Justices' limited powers to promulgate those rules and review cases on appeal, it is unclear what they could have done to alter the course taken by the lower courts in these circumstances.[14]

The only new information Plaintiffs offer is a recent disciplinary decision, *In re Ademiluyi*, 321 A.3d 142 (Md. 2024), which they cite as evidence of "the broad role and responsibilities of the Maryland Supreme Court beyond mere rulemaking." (ECF No. 74 at 34 n.14.) This, too, is unavailing. For one, bare assertions of roles "beyond mere rulemaking" are insufficient to survive summary judgment. *See Bouchat*, 346 F.3d at 522 ("A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings . . . .'" (quoting Fed. R. Civ. P. 56(e))). For another, the decision is the product of a judicial misconduct

---

[14] The Court notes a related infirmity in Plaintiffs' case. Defendants concede that "[t]he Justices *can* promulgate rules to ensure that, in issuing writs of garnishment, subpoenas in aid of enforcement, and orders on writs of garnishment, lower courts adhere to the SCRA's requirements." (ECF No. 73-1 at 5 (emphasis added).) But they also note Maryland's courts have a separate obligation to follow the SCRA and other federal law—a freestanding duty that "flows directly *from* federal law, not from any direction that the Justices may provide outside the setting of the Maryland Rules or their disposition of cases" on appeal. (*Id.* at 20–21 (emphasis added).) In other words, the lower courts were bound by the SCRA regardless of the content of the rules. As a result, any failure on the part of those courts was certainly a more proximate cause, and arguably even a supervening cause, of Plaintiffs' injuries, at least relative to anything the Justices could have done. And to the extent Plaintiffs seek to impose a duty upon the State to *restate* a federal statute, not merely to avoid conflicting with it, the argument raises concerns about legislative commandeering. *Cf., e.g., New York v. United States*, 505 U.S. 144, 175–76 (1992) (noting that "the Constitution does not empower Congress to subject state governments" to "a simple command . . . to implement legislation enacted by Congress").

proceeding. *See* 321 A.3d at 60 ("In accordance with Maryland Rule 18-435(c), the [Maryland Commission on Judicial Disabilities] referred the matter to this Court for final disposition."). This appears to be precisely the sort of "traditional adjudicative task" *Consumers Union* distinguished from "independent enforcement authority," *see* 446 U.S. at 724, 734, and which would be shielded by judicial immunity, *see id.* at 734–36. Even taking the disciplinary decision for all it is worth— as evidence of the Justices' capacity to discipline lower-court judges—it simply does not jibe with Plaintiffs' theory that the Justices failed to *prevent* something from happening. *See supra* Section III.A.2.i. Nor is it this Court's duty to square the two. *Cf. Grandy v. City of Baltimore*, Civ. No. ELH-18-1330, 2018 WL 6726546, at \*9 (D. Md. Dec. 20, 2018) ("Judges 'are not like pigs, hunting for truffles buried in the briefs,' nor is it the Court's 'job to wade through the record and make arguments for either party.'" (citation omitted)).

At bottom, this Court has an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation omitted). While it recognizes the Justices have some ability to prevent or correct errors by Maryland's lower courts, *see supra* Section III.A.2.i, and even that they may have an enforcement capacity beyond the four corners of this case, *see* (ECF No. 58 at 35–36), the Court is not persuaded the Justices have any such capacity that connects with Plaintiffs' alleged harms. And because Plaintiffs have failed to articulate one, their attempts to distinguish *Consumers Union* fall flat. *See* (ECF No. 74 at 24–25 (arguing that the case merely "applied some limited legislative immunity . . . to judicial officers acting solely in their rule-making capacity")). As a result, every function that might support Plaintiffs' claim is foreclosed by some individual immunity, *see* (ECF No. 58 at 36–37), and there is no legal basis for Plaintiffs' case to move forward, let alone a factual dispute for trial.

Accordingly, summary judgment will be granted for Defendants.

23

**B.      Plaintiff's Motion for Leave to File a Second Amended Complaint**

In their proposed Second Amended Complaint for Damages, Plaintiffs seek to name as defendants the State of Maryland, the administrative judges of the District Court of Maryland for Anne Arundel and Garrett Counties ("Administrative Judges"), and the administrative clerks of the same ("Administrative Clerks").  (ECF No. 72-2 at 1.)  Plaintiffs also slightly broaden their allegations against all governmental defendants, new and old.  *Compare, e.g.*, (*id.* at ¶ 4 (anchoring claim to the State's "customs, operations, laws, rule[s] of procedure, and practices")), *with* (ECF No. 42 at ¶ 4 (anchoring claim only to "laws and rule[s] of procedure")).

In light of the Court's determinations as to Defendants' Motion for Summary Judgment, *see generally supra* Section III.A, Plaintiffs' proposed amendments offer no legal basis for their SCRA claim to proceed.  And while "conjecture about the merits of the litigation should not enter into the decision whether to allow amendment," leave to amend is unavailable when the "proposed amendment may clearly be seen to be futile because of substantive or procedural considerations." *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980).  This is one such instance.  For that reason, Plaintiffs' Motion for Leave to Amend will be denied.[15]

1.      Plaintiffs' Proposed Additional Parties Do Not Plausibly Support Plaintiffs' Theory of Harm.

Plaintiffs offer multiple reasons for the addition of new defendants to their case.  They seek to add the State of Maryland because, as a practical matter, their claim is already against the State, and because they believe it unnecessary to moor their SCRA theory to the conduct of particular state officials.  *See* (ECF No. 72 at 6 (proposing to amend, in part, "to conform the[] operative

---

[15] Plaintiffs separately argue their proposed amendment is "not made with undue delay to [p]rejudice the State of Maryland," citing in part the fact of having filed it "on the deadline established by the Court's current Order."  (ECF No. 72 at 6 (citing ECF No. 71).)  They also argue the proposed amendment "would not cause prejudice" and "is made in good faith."  (*Id.* at 8.)  Defendants do not oppose amendment on any of these grounds, *see, e.g.*, (ECF No. 73-1 at 23), and because the Court determines amendment would be futile in any event, the Court need not consider them.

complaint [to] the law of the case, the facts [Plaintiffs] know now, and the claims remaining before the Court")). And to the extent the Court deems official-specific allegations necessary, Plaintiffs seek to add the Administrative Judges and Clerks to bypass the individual immunities that shield the Justices. *See* (*id.* (proposing to amend, in part, "to moot the various affirmative defenses raised by the State of Maryland[,] should those defenses even apply to [Plaintiffs'] claims")).

While these proposed additions are not without foundation, they are ultimately useless. As Plaintiffs themselves admit, the State of Maryland is already the functional defendant in this litigation. And the addition of the Administrative Judges and Clerks simply does not support Plaintiffs' theory of harm. Even to the extent that it could, it otherwise fails to pierce Defendants' individual immunities. The Court addresses each proposed addition below.

> ### i.    *Plaintiffs' Addition of the State of Maryland is Unnecessary.*

There is no doubt Maryland is the real party in interest in Plaintiffs' case, particularly now that the case is narrowed to a single damages claim. *See* (ECF No. 58 at 27). Again, an official-capacity action against a public official is "generally . . . only another way of pleading an action against an entity of which [that official] is an agent." *Graham*, 473 U.S. at 166 (citation omitted). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* (citation omitted). Since the filing of their initial complaint, Plaintiffs have pressed official-capacity claims against officials of the State of Maryland. (ECF No. 1 at 1, ¶ 25; ECF No. 42 at 1, ¶¶ 27–29.) Plaintiffs have also made clear in the body of their prior pleadings that their claims are against the State itself, vis-à-vis the conduct of certain relevant employees. *E.g.*, (ECF No. 1 at ¶¶ 6, 10–13; ECF No. 42 at ¶¶ 8, 11–14). And both this Court and Defendants have, at various points, referred to Defendants as "the State." *See, e.g.*, (ECF No. 58 at 27; ECF No. 73-1 at 9).

As a result, the Court is unpersuaded that naming the State as a defendant will effect any

change in Plaintiffs' case. Even Plaintiffs suggest the addition is unnecessary. *See* (ECF No. 74 at 29). For their part, Defendants chalk the addition up to an attempt to "generically fault[] the State" rather than prove some official, acting in a capacity unshielded by an individual immunity, caused Plaintiffs' injuries. *See* (ECF No. 73-1 at 26). Defendants are correct insofar as they argue that any theory of liability against a State, whether in name or in effect, must be founded upon the acts of that State's employees. *See supra* Section III.A.3. And to the extent Plaintiffs seek to add the State merely to clarify the source of their desired recovery, such clarification is unnecessary, as, again, Plaintiffs' damages claims have always been directed to the state treasury. *See, e.g.*, (ECF No. 42 at ¶ 14 (seeking "the recovery of all other appropriate relief, including money damages, . . . from the State of Maryland")).

Because adding the State of Maryland would be fruitless, the Court will not grant leave to amend on that basis.

> ii.     *Plaintiffs' Addition of the Administrative Judges and Administrative Clerks is Futile.*

As with their proposal to add the State of Maryland, Plaintiffs say little about why adding the Administrative Judges and Clerks would *not* be futile, arguing only that adding these officials would "support [Plaintiffs'] original claims against the State of Maryland." *See* (ECF No. 72 at 7). For their part, Defendants interpret the amendment as an attempt to "avoid[] legislative immunity," (ECF No. 73-1 at 23), and argue that Plaintiffs' theories concerning these officials are "every bit as conclusory as Plaintiffs' claims against the Justices," (*id.* at 24).

The Court agrees with Defendants: Plaintiffs' conclusory allegations do not merit these officials' addition to the case. Simply, Plaintiffs allege no specific acts that connect the officials to Plaintiffs' injuries. Instead, Plaintiffs' offer nebulous descriptions of the officials' roles and acts—stating, for instance, that the Administrative Judges are "responsible for the administration and operation" of their respective courts, (ECF No. 72-2 at ¶¶ 20–21), and that "[t]he State of

26

Maryland and the officials carrying out the work" of the district courts allowed judicial process to run without conforming the proceedings to the SCRA, *see, e.g.*, (*id.* at ¶¶ 44–47, 62–66, 75–82). Indeed, the proposed pleadings cast the Administrative Judges and Clerks as something of an afterthought. *See, e.g.*, (*id.* at ¶¶ 20–21 (explaining that the officials are "added to this action . . . if it is determined that [the Justices] and the State itself are not the proper parties . . . from who[m] Plaintiffs may recover"); *id.* at ¶ 93 (seeking relief "against the State through the [Justices]," or, "[i]f necessary in the alternative, . . . against the State through the administrative judges and administrative clerks")).   While alternative pleading is doubtless permissible under the Federal Rules, *see* Fed. R. Civ. P. 8(d)(2)–(3), these pleadings must still be supported by law and facts.

At bottom, Plaintiffs' claims against the Administrative Judges and Clerks suffer from the same basic problem as their claim against the Justices.   Plaintiffs offer bare allegations of an enforcement capacity—no facts about actions taken in that capacity, let alone facts connecting the actions to the alleged injuries.   At this juncture, it is not enough for Plaintiffs nakedly to assert that certain officials hold "administrative" or "enforcement" duties with respect to relevant court units. *See supra* Section III.A.3.   That just leaves the Court to wonder how, exactly, the Administrative Judges and Clerks factor into the litigation.[16]   And while this style of pleading may have been enough to survive dismissal the first time, Plaintiffs were on notice that summary judgment was imminent unless they showed the Justices to have a relevant enforcement function.   *See* (ECF No.

---

[16] Absent from every version of Plaintiffs' pleadings is any assertion about the judges who rendered the erroneous collections orders.   And for good reason: judicial immunity shields them from liability for those decisions, *see, e.g.*, *Stump*, 435 U.S. at 356–57—and, under the reasoning above, shields the State as well, *see supra* Section III.A.2.iii. The Court notes, however, that Plaintiffs' unadorned allegations against the Administrative Judges and Clerks verge on becoming forbidden claims against the rendering judges.   Unlike the Justices, the Administrative Judges and Clerks have no duties related to the Maryland Court Rules; their roles are instead limited to deciding cases and/or courthouse administration.   *See* Md. Const. art. IV, §§ 1, 41A, 41E, 41F.   Because it is unclear, based on that, what these officials could have done to prevent the rendering of erroneous orders by other judicial personnel, the Court is tempted to conclude the kernel of Plaintiffs' grievance is the rendering itself.   If that is the case, both the Administrative Judges and Clerks would very likely be shielded by either judicial immunity, *see, e.g.*, *Stump*, 435 U.S. at 356–57, or quasi-judicial immunity, *see, e.g.*, *Scruggs v. Moellering*, 870 F.2d 376, 377 (7th Cir. 1989) (holding that judges' immunity extends to other court personnel in light of "[t]he danger that disappointed litigants, blocked by the doctrine of absolute immunity from suing the judge directly, will vent their wrath on clerks, court reporters, and other judicial adjuncts").

58 at 36–37). Simply, the Court will not allow Plaintiffs to make amended allegations virtually identical to others held insufficient elsewhere in the same decision. *See supra* Section III.A.

Because adding the Administrative Judges and Clerks would be fruitless as well, the Court will not grant leave to amend on that basis, either.

> ### 2. Plaintiffs' Broadened Allegations Fail to Allege, in Sufficient Detail, Acts Not Foreclosed by Individual Immunity.

Plaintiffs broaden their allegations against Defendants, old and new, primarily by adding to the list of control mechanisms over which Defendants are alleged to hold influence. *Compare, e.g.*, (ECF No. 72-2 at ¶ 4 ("customs, operations, laws, rule[s] of procedure, and practices")), *with* (ECF No. 42 at ¶ 4 ("laws and rule[s] of procedure")). As Defendants point out, Plaintiffs also "pepper" the proposed Second Amended Complaint with the phrase "customs, operations, and practices." (ECF No. 73-1 at 23 (citation omitted).)

Merely asserting the existence of an enforcement capacity does not make it so. Plaintiffs' conclusory allegations of pertinent administrative or enforcement duties are analogous to their nonspecific reasons for including the Administrative Judges and Clerks—reasons which, in turn, are little different from those the Court deems insufficient to counter summary judgment as to the Justices. *See supra* Section III.B.1.ii. Again, the Court's earlier ruling put Plaintiffs on notice that bare allegations of nonimmune activities would not suffice to push Plaintiffs' case to trial. *See* (ECF No. 58 at 36–37); *see also Bouchat*, 346 F.3d at 526. The delay that would result from allowing such allegations to survive until *another* motion for summary judgment is reason enough to deny leave to amend.[17] *See Foman*, 371 U.S. at 182.

---

[17] Defendants also argue the allegations fail under the pleading requirements of Rule 8. (*See* ECF No. 73-1 at 24 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); and then citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).) But because the Court already allowed similar allegations to proceed under that standard, (*see* ECF No. 58 at 36), it will not reject these on that basis.

## IV.    CONCLUSION

Today's decision does not foreclose the possibility of recovering against a State for SCRA violations by state officials. On the basis of these pleadings, however, the decision does reaffirm two bedrock principles. First, bare allegations of critical law and facts cannot suffice to move a case to trial. Second, claims founded on fundamentally legislative or judicial acts are barred by individual immunities, notwithstanding the absence of state *sovereign* immunity in cases arising under Congress's power to raise and support a military.

The Court acknowledges the difficulties that pervade this case. As the Court and Plaintiffs have repeatedly stated, Plaintiffs' claim is functionally against the State itself. *See supra* Section III.A.2.iii; (ECF No. 42 at ¶¶ 8, 11–14, 29). As a result, it may seem unfair for the Court to deny relief on the basis of an immunity designed to protect state officials. Indeed, it may be particularly puzzling given the Court's earlier conclusion that the Constitution itself eliminates state sovereign immunity—a defense otherwise tailor made for damages suits like this. *See, e.g.*, *Bd. of Trs. of Univ. of Ala. v. Garett*, 531 U.S. 356, 363–64 (2001). In view of these wrinkles, alongside the admonition that the SCRA "must be read with an eye friendly to those who dropped their affairs to answer their country's call," *cf. Le Maistre v. Leffers*, 333 U.S. 1, 6 (1948) (interpreting the SCRA's predecessor statute), Plaintiffs may well feel unfairly caught in something of an "exception" to the SCRA's requirements. *See* (ECF No. 74 at 20).

Even so, both law and prudence ordain today's result. This is not an instance of a court engrafting an immunity onto an unsuitable host. While Plaintiffs' case *is* against the State itself, each of Plaintiffs' theories necessarily relies on conduct by state officials. *See, e.g.*, (ECF No. 42 at ¶¶ 28–29, 169; ECF No. 72-2 at ¶¶ 17–22, 93). And, for the conduct Plaintiffs have alleged, some individual immunity poses an absolute bar to recovery against the officials personally. *See supra* Sections III.A.2.ii, .B.1.ii. The lesson of *Consumers Union* is that a backdoor recovery

against the State is unavailable in such circumstances. *See* 446 U.S. at 738 ("[T]he District Court's award . . . in this case was premised on acts or omissions for which [defendants] enjoyed absolute legislative immunity. This was error."). This principle holds true even in the odd corner of the law Plaintiffs have identified—a zone in which the State, unable to avail itself of the usual defense of sovereign immunity, is left to stand essentially naked against the prospect of financial recovery.

Nor can the Court agree this result means "Congress created a right for servicemembers without a remedy." (ECF No. 74 at 16.) As Defendants point out, Plaintiffs could, and did, avail themselves of remedies in the state courts—namely, the vacating of the foreign judgments and/or dismissal of the collections actions. (ECF No. 73-1 at 21–22); *see also* (*id.* at 22–23 (noting options of mandamus and ordinary appeal)). And it is not as if the State is the only entity capable of compensating Plaintiffs for their injuries. As Plaintiffs have articulated their case, the Maryland courts' missteps were at least partly attributable to LeMay, who failed to supply critical—and required—information about Plaintiffs' military status. *See, e.g.*, (ECF No. 42 at ¶¶ 30(c), 32(d), 64, 93, 140; ECF No. 72-2 at ¶¶ 23, 44, 58, 75). Plaintiffs elected to attempt to allocate their alleged losses *between* LeMay and the State of Maryland, rather than to recover from LeMay alone.[18] *See* (ECF No. 73-1 at 22). This choice was not mandated by the SCRA.

Finally, even if Plaintiffs were wholly bereft of relief, it is well settled that federal courts cannot redress every harm that crosses their dockets. Although it has been said "that every right, when withheld, must have a remedy," *Marbury v. Madison*, 5 U.S. 137, 147 (1803); *see also* (ECF No. 74 at 13), Chief Justice Marshall also recognized that our system of government, in all its texture and complexity, demanded the occasional exception to that lofty ideal. *See, e.g.*, *United*

---

[18] Insofar as the SCRA permits or requires defendants to be held jointly liable, Plaintiffs' claim against the State may in fact be barred to the extent of their settlement with LeMay. *See, e.g.*, *Gilliam v. Allen*, 62 F.4th 829, 846 (4th Cir. 2023) (stating the rule against double recoveries, also known as the one-satisfaction rule, which "operates to reduce a plaintiff's recovery from [a] nonsettling defendant to prevent the plaintiff from recovering twice from the same assessment of liability" (citation omitted)). The Court makes no findings or determinations on this issue.

*States v. Clarke*, 33 U.S. 436, 444 (1834). This is perhaps no truer anywhere than in the domain of absolute individual immunities. *See, e.g.*, *Consumers Union*, 446 U.S. at 731–33; *Mireles v. Waco*, 502 U.S. 9, 9–10 (1991).

No doubt, legislators and judges make mistakes. And the nature of their authority can lead these mistakes to have significant consequences. But our interest in affording core officials "the breathing room necessary to make . . . choices in the public interest," *EEOC v. Wash. Suburb. Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011), often demands they be free from the specter of financial liability, whether large or small, for themselves or for the institutions they serve—even if the result is that real harms occasionally go unrectified. *See Mireles*, 502 U.S. at 10; *Butz v. Economou*, 438 U.S. 478, 514 (1978).

DATED this 26 day of November, 2024.

BY THE COURT:

James K. Bredar
United States District Judge

31